# INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS ET AL. *v.* FOUST

No. 78–38.   Argued February 26, 1979—Decided May 29, 1979

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, and POWELL, JJ., joined. BLACKMUN, J., filed an opinion concurring in the result, in which BURGER, C. J., and REHNQUIST and STEVENS, JJ., joined, *post*, p. 52.

*Laurence J. Cohen* argued the cause for petitioners. With him on the briefs were *William J. Hickey, Laurence Gold,* and *George Kaufmann.*

*Terry W. Mackey* argued the cause and filed a brief for respondent.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This action arises from the failure of petitioner union properly to process respondent's grievance alleging wrongful discharge by his employer. The question presented is whether the Railway Labor Act [1] permits an employee to recover punitive damages for such a breach of a union's duty of fair representation.

I

Respondent, a member of the International Brotherhood of Electrical Workers (IBEW), was injured in March 1970 while working for the Union Pacific Railroad Co. (Union Pacific). He received a medical leave of absence through December 22, 1970. The collective-bargaining agreement between the union and the company required that employees either request an extension before their leave expired or return to work as scheduled. Accordingly, respondent sought to renew his leave in late December. Correspondence between Union Pacific and respondent's attorney, however, revealed that the company had not received a doctor's statement supporting respondent's request. Notwithstanding Union Pacific's written assurance on January 25, 1971, that it would await arrival of this document before reviewing respondent's

---

[1] 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.*

case, respondent was discharged on February 3 because, in the company's view, he had not properly requested an extension.

After respondent's attorney failed to persuade Union Pacific to reconsider its decision, he wrote the IBEW District Chairman, D. F. Jones, requesting that the union initiate grievance proceedings on respondent's behalf pursuant to Rule 21 of the collective-bargaining agreement.[2] The letter was dated March 26, and was received by Jones on March 27, 52 days after the dismissal. Although Jones was aware that Rule 21 required presentation of grievances "within 60 days from the date of the occurrence on which the claim . . . is based," see n. 2, *supra,* and that this deadline was imminent, he did not immediately prepare a grievance letter. Rather, he contacted the IBEW General Chairman, Leo Wisniski, who insisted that respondent personally request in writing the union's assistance. Wisniski drafted a letter stating that the union could not "handle" the claim until such an authorization was received. App. to Brief for Respondent 8a. Instead of telephoning respondent or sending the letter directly to him, Wisniski mailed the letter to Jones, who then signed and forwarded it to respondent on April 5, 61 days after the discharge. Without awaiting the requested written authorization, Jones filed respondent's claim with Union Pacific on April 6, two days after the time for submission had expired. The claim form had been prepared by Wisniski in Omaha, Neb., sent to Jones in Rawlins, Wyo., and then mailed by Jones to the railroad in Omaha.

Both Union Pacific and the National Railroad Adjustment Board denied respondent's claim on the ground that IBEW had not complied with the 60-day filing deadline. Respondent then brought this suit against the union and several of

---

[2] Rule 21 (a) (1) provides:

"All claims or grievances must be presented in writing by . . . or on behalf of the employee involved, to the officer of the Carrier authorized to receive same, within 60 days from the date of the occurrence on which the claim or grievance is based."

its officers.[3]   He alleged that by filing the grievance out of time, the union had breached its duty of fair representation, which resulted in dismissal of his wrongful discharge claim. A jury found for respondent, awarding him $40,000 actual damages and $75,000 punitive damages, and the District Court accepted the jury's award. No. C 74–50B (Wyo., May 17, 1976).

The Court of Appeals affirmed the District Court's judgment in most respects, but remanded the case for consideration of whether the punitive damages award was excessive. 572 F. 2d 710 (CA10 1978).[4]   It rejected the suggestion of the Court of Appeals for the Third Circuit that punitive damages are impermissible in unfair representation suits,[5] and declined to adopt the Eighth Circuit's standard, which allows punitive damages only when union officers display malice toward the employee.[6]   Rather, following the Fourth Circuit, the Court of Appeals ruled that a punitive award is appropriate if a

---

[3] Prior to initiating this action, respondent filed a separate suit against the railroad seeking recovery for work-related personal injuries and for the allegedly wrongful discharge.. As part of a settlement of the personal injury action, respondent waived his wrongful discharge claim.  App. 73.

[4] The court held, *inter alia,* that the jury was correctly instructed on the elements of the cause of action and on the principles for assessing actual damages.  It also found the evidence sufficient to support the jury verdict.  572 F. 2d, at 714–718.

Our grant of certiorari was limited to the punitive damages question. See 439 U. S. 892 (1978).  Consequently, for purposes of our analysis, we must take as correct the findings below that IBEW breached its duty of fair representation and that the $40,000 compensatory damages award was proper.

[5] *Deboles* v. *Trans World Airlines, Inc.,* 552 F. 2d 1005, 1019 (CA3), cert. denied, 434 U. S. 837 (1977).  See also *Williams* v. *Pacific Maritime Assn.,* 421 F. 2d 1287 (CA9 1970).

[6] See *Butler* v. *Teamsters Local 823,* 514 F. 2d 442, 454 (CA8), cert. denied, 423 U. S. 924 (1975).  Under the Eighth Circuit's analysis, plaintiffs may be required to demonstrate that punitive damages are needed to deter future union misconduct.  See 514 F. 2d, at 454; *Emmanuel* v. *Omaha Carpenters District Council,* 560 F. 2d 382, 386 (CA8 1977).

union has acted wantonly or in reckless disregard of an employee's rights. See *Harrison* v. *United Transportation Union*, 530 F. 2d 558, 563–564 (CA4 1975), cert. denied, 425 U. S. 958 (1976).[7]

We granted certiorari to resolve this conflict among the Courts of Appeals as to what if any circumstances justify assessing punitive damages against a union that breaches its duty of fair representation. 439 U. S. 892 (1978).

## II

This Court first recognized the statutory duty of fair representation in *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192 (1944), a case arising under the Railway Labor Act. *Steele* held that when Congress empowered unions to bargain exclusively for all employees in a particular bargaining unit, and thereby subordinated individual interests to the interests of the unit as a whole, it imposed on unions a correlative duty "inseparable from the power of representation" to exercise that authority fairly. *Id.*, at 202–204; see *Humphrey* v. *Moore*, 375 U. S. 335, 342 (1964); *Vaca* v. *Sipes*, 386 U. S. 171, 182 (1967); *Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S. 554, 564 (1976).[8] The fair representation doctrine thus serves

---

[7] The court below further determined that the jury instructions comported with this legal standard. The District Court had charged the jury that it could award punitive damages if petitioners acted "maliciously, or wantonly, or oppressively." App. 65.

MR. JUSTICE BLACKMUN surmises that "as a matter of law," the union's conduct "betrayed nothing more than negligence." *Post*, at 53. This conclusion necessarily assumes that there was insufficient evidence of malicious, wanton, or oppressive conduct to justify the jury's punitive damages award. We, however, are unwilling to substitute our judgment for that of the jury, District Court, and Court of Appeals on this essentially evidentiary question. See Tr. 270–271; App. 91–94; 572 F. 2d, at 719; *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.*, 336 U. S. 271, 275 (1949); *Berenyi* v. *Immigration Director*, 385 U. S. 630, 635–636 (1967).

[8] The duty of fair representation is also implicit in the National Labor Relations Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.*, because

as a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca* v. *Sipes, supra,* at 182. Under the doctrine, a union must represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective-bargaining agreements. See, *e. g., Conley* v. *Gibson,* 355 U. S. 41, 46 (1957); *Humphrey* v. *Moore, supra,* at 342; *Hines* v. *Anchor Motor Freight, Inc., supra,* at 563–567. In particular, a union breaches its duty when its conduct is "arbitrary, discriminatory, or in bad faith," as, for example, when it "arbitrarily ignore[s] a meritorious grievance or process[es] it in [a] perfunctory fashion." *Vaca* v. *Sipes, supra,* at 190, 191.

The right to bring unfair representation actions is judicially "implied from the statute and the policy which it has adopted," *Steele* v. *Louisville & Nashville R. Co., supra,* at 204, and Congress has not specified what remedies are available in these suits.[9] Our function, therefore, is to implement a remedial scheme that will best effectuate the purposes of the Railway Labor Act, recognizing that the overarching legislative goal is to facilitate collective bargaining and to achieve industrial peace. See 323 U. S., at 204; *Textile Workers* v.

---

that statute, like the Railway Labor Act, affords unions exclusive power to represent all employees of a bargaining unit. See, *e. g., Syres* v. *Oil Workers,* 350 U. S. 892 (1955); *Ford Motor Co.* v. *Huffman,* 345 U. S. 330 (1953); *Vaca* v. *Sipes,* 386 U. S., at 177. For a discussion of the similarities between unfair representation suits under the two Acts, see Feller, A General Theory of the Collective Bargaining Agreement, 61 Calif. L. Rev. 663, 676–718 (1973).

[9] Contrary to the fears expressed in the opinion concurring in the result, *post,* at 59, we express no view on the propriety of punitive awards in suits under the Landrum-Griffin Act. We are concerned here with judicially created remedies for a judicially implied cause of action. Whether the explicit statutory language of 29 U. S. C. §§ 411 and 412 and the accompanying legislative history authorize punitive damages awards obviously involves different considerations.

*Lincoln Mills,* 353 U. S. 448, 456–457 (1957); *Machinists* v. *Street,* 367 U. S. 740, 759 (1961); cf. *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943). Whether awarding punitive damages would comport with this national labor policy is the issue on which the instant case turns.

III

Punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 350 (1974).[10] In respondent's view, this extraordinary sanction is necessary to vindicate an employee's right to fair representation. Because actual damages caused by a union's failure to pursue grievances may be *de minimis,* see *Harrison* v. *United Transportation Union, supra,* at 563; *St. Clair* v. *Local Union No. 515,* 422 F. 2d 128, 132 (CA6 1969); see also *infra,* at 50, respondent contends that a strong legal remedy is essential to encourage unfair representation suits and thereby inhibit union misconduct.

We do not doubt that the prospect of lucrative monetary recoveries unrelated to actual injury would be a powerful incentive to bring unfair representation actions. Similarly, the threat of large punitive sanctions would likely affect unions' willingness to pursue individual complaints. However, offsetting these potential benefits is the possibility that punitive awards could impair the financial stability of unions and unsettle the careful balance of individual and collective interests which this Court has previously articulated in the unfair representation area.

The fundamental purpose of unfair representation suits is to compensate for injuries caused by violations of employees'

---

[10] See W. Prosser, Law of Torts § 2, pp. 9–11 (4th ed. 1971) (hereinafter Prosser); D. Dobbs, Law of Remedies § 3.9, p. 204 (1973); *Scott* v. *Donald,* 165 U. S. 58, 86 (1897).

rights. In approving "resort to the *usual* judicial remedies of injunction and award of damages when appropriate," *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S., at 207 (emphasis added), the Court emphasized that relief in each case should be fashioned to make the injured employee whole. *Id.*, at 206–207. This compensation principle was again invoked in *Vaca* v. *Sipes, supra,* to govern an unfair representation suit for compensatory and punitive damages based on a union's refusal to process a grievance alleging wrongful discharge.[11] The Court there rejected the contention that an order compelling arbitration was the employee's only remedy, and concluded that damages and equitable relief could be awarded when necessary to ensure full compensation. 386 U. S., at 196.[12]

The Court in *Vaca* applied the compensation principle not only to gauge the sufficiency of relief but also to limit union liability. Because an employee can recover in full from his employer for its breach of contract, we reasoned that a union which fails to process a grievance predicated on that breach cannot be held liable for damages attributable to the employ-

---

[11] *Vaca* involved a union certified under the National Labor Relations Act and a collective-bargaining agreement that permitted employees to initiate the grievance process, but precluded them from personally pursuing arbitration once grievance procedures were exhausted. 386 U. S., at 175 n. 3. The Railway Labor Act is somewhat more solicitous of individual rights. It authorizes employees who are unsuccessful at the grievance level to seek relief in their own right from the National Railroad Adjustment Board. §§ 3 First (i), (j), 45 U. S. C. §§ 153 First (i), (j).

[12] The compensation principle is also reflected in *Vaca's* refusal to hold unfair representation claims within the exclusive jurisdiction of the National Labor Relations Board. Because the "public interest in effectuating the policies of the federal labor laws, *not the wrong done the individual employee,* is always the Board's principal concern in fashioning unfair labor practice remedies," we feared that denial of a judicial forum might "frustrate the basic purposes underlying the duty of fair representation." *Vaca* v. *Sipes, supra,* at 182 n. 8, 183 (emphasis added). See also *Glover* v. *St. Louis-San Francisco R. Co.*, 393 U. S. 324, 328–329 (1969).

er's conduct. *Id.*, at 197. Recognizing the "real hardship" that large damages awards could impose on unions, the Court found "no merit in requiring [them] to pay the employer's share of the damages." *Ibid.* To avoid burdening unions beyond the extent necessary to compensate employees for their injuries, we refused to create an exception even for those unions with indemnification rights against employers. *Ibid.* Although acknowledging that this apportionment rule might in some instances effectively immunize unions from liability for a clear breach of duty, the Court found considerations of deterrence insufficient to risk endangering the financial stability of such institutions. *Id.*, at 198. Accordingly, we vacated the jury's award of compensatory and punitive damages against the union since "all or almost all" of the employee's damages were attributable to the discharge. *Ibid.*[13]

This limitation on union liability thus reflects an attempt to afford individual employees redress for injuries caused by union misconduct without compromising the collective interests of union members in protecting limited funds. To permit punitive damages, which, by definition, provide monetary relief "in excess of . . . actual loss," *Scott* v. *Donald,* 165 U. S. 58, 86 (1897), could undermine this careful accommodation. Because juries are accorded broad discretion both as to the imposition and amount of punitive damages, see *Gertz* v. *Robert Welch, Inc., supra,* at 349–350; Prosser § 2, pp. 13–14, the impact of these windfall recoveries is unpredictable and potentially substantial. Cf. *Hall* v. *Cole,* 412 U. S. 1, 9 n. 13 (1973).[14] Such awards could deplete union treasuries,

---

[13] On similar reasoning, the Court has applied *Vaca's* apportionment principle to cases arising under the Railway Labor Act. In *Czosek* v. *O'Mara,* 397 U. S. 25, 29 (1970), we held that "damages against the union for loss of employment are unrecoverable except to the extent that its refusal to handle the grievances added to the difficulty and expense of collecting from the employer."

[14] Moreover, it cannot be ignored that punitive damages may be em-

thereby impairing the effectiveness of unions as collective-bargaining agents. Inflicting this risk on employees, whose welfare depends upon the strength of their union, is simply too great a price for whatever deterrent effect punitive damages may have. Cf. *Automobile Workers* v. *Russell,* 356 U. S. 634, 658 (1958) (Warren, C. J., dissenting).

Additionally, the prospect of punitive damages in cases such as this could curtail the broad discretion that *Vaca* afforded unions in handling grievances. We there rejected the notion that employees could force unions to process their claims irrespective of the terms of the collective-bargaining agreement, and ruled that a union satisfies its obligation to represent employees fairly if it does not "arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." *Vaca* v. *Sipes,* 386 U. S., at 191–194. In so holding, the Court stressed that union discretion is essential to the proper functioning of the collective-bargaining system. Union supervision of employee complaints promotes settlements, avoids processing of frivolous claims, and strengthens the employer's confidence in the union. *Id.,* at 191–193. Without these screening and settlement procedures, the Court found that the costs of private dispute resolution could ultimately render the system impracticable. *Ibid.*

Just as unlimited access to the grievance process could undermine collective bargaining, so too the threat of punitive

---

ployed to punish unpopular defendants. As we observed in the defamation context:

"[Since] juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused . . . they remain free to use their discretion selectively to punish expressions of unpopular views. Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger . . . ." *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 350 (1974).

Community hostility toward unions, management, or minority views can thus find expression in punitive awards. See *Automobile Workers* v. *Russell,* 356 U. S. 634, 651 (1958) (Warren, C. J., dissenting).

damages could disrupt the responsible decisionmaking essential to peaceful labor relations. In order to protect against a future punitive award of unforeseeable magnitude, unions might feel compelled to process frivolous claims or resist fair settlements. Indeed, even those unions confident that most juries would hold in their favor could be deterred by the possibility of punitive damages from taking actions clearly in the interest of union members. Absent clear congressional guidance, we decline to inject such an element of uncertainty into union decisions regarding their representative functions.

Acknowledging the "essentially remedial" objectives of the National Labor Relations Act, this Court has refused to permit punitive sanctions in certain unfair labor practice cases, see, *e. g., Republic Steel Corp.* v. *NLRB,* 311 U. S. 7, 10–12 (1940); *Carpenters* v. *NLRB,* 365 U. S. 651, 655 (1961), and in actions under § 303 of the Labor Management Relations Act, 29 U. S. C. § 187, *Teamsters* v. *Morton,* 377 U. S. 252, 260–261 (1964). Like the NLRA, the Railway Labor Act is essentially remedial in purpose. See *supra,* at 47–48; 45 U. S. C. § 151a; *Virginian R. Co.* v. *Railway Employees,* 300 U. S. 515, 542–548 (1937); *Machinists* v. *Street,* 367 U. S., at 759–760; see also *Republic Steel Corp.* v. *NLRB, supra,* at 10–11. Because general labor policy disfavors punishment, and the adverse consequences of punitive damages awards could be substantial, we hold that such damages may not be assessed against a union that breaches its duty of fair representation by failing properly to pursue a grievance. Accordingly, we reverse the judgment below insofar as it upheld the award of punitive damages.

*So ordered.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, MR. JUSTICE REHNQUIST, and MR. JUSTICE STEVENS join, concurring in the result.

The Court now adopts a *per se* rule that a union's breach of its duty of fair representation can never render it liable for

punitive damages, no matter how egregious its breach may be. I seriously doubt both the correctness and the wisdom of this holding. Whatever the merits of the Court's *per se* rule, however, there is no need to propound such a blanket proscription in this particular case. The union's conduct here betrayed nothing more than negligence, and thus presented an inappropriate occasion for awarding punitive damages under any formula. In order to dispose of this case, therefore, the Court need hold only that the trial judge erred as a matter of law in submitting the punitive damages issue to the jury; this is the holding I would adopt. Inasmuch as the Court reaches to outlaw punitive damages in *all* unfair representation cases, I shall attempt to show why I think the Court errs and why I concur only in the result.

## A

Because the duty of fair representation is judicially created, the consequences of its breach necessarily are left to judicial determination. "The appropriate remedy for a breach of a union's duty of fair representation," the Court wrote in *Vaca* v. *Sipes*, 386 U. S. 171, 195 (1967), "must vary with the circumstances of the particular breach." Depending on the circumstances of the particular breach, the Court wrote in *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192, 207 (1944), "the statute contemplates resort to the usual judicial remedies of injunction and award of damages." These cases make clear that a court, seeking a remedy to match the union's wrong, has at its disposal the full panoply of tools traditionally used by courts to do justice between parties. Punitive damages, being one of these tools, thus are presumptively available for use in appropriate cases, unless Congress has directed otherwise. Since Congress has never expressly interdicted their use, the Court's decision to ban punitive damages from the arsenal necessarily rests upon inference—upon a perception that punitive damages in unfair representation

suits are *per se* inconsistent with "federal labor policy." The Court proffers four main theories to support this inference. I find none of them persuasive.

First, the Court discerns in *Vaca* and *Steele* a "compensation principle," a principle supposedly dictating that a damages award may "make the injured employee whole," but may do no more. *Ante,* at 49, and n. 12. If these cases do embody a "compensation principle"—really, a neologism in this area of the law—it is a principle of a vastly different sort from that on which the Court relies. *Steele* and *Vaca* assuredly do stand for the proposition that a worker injured by his union's breach of duty must *at least* be made whole. In *Steele* the Court held the plaintiffs entitled to a judicial damages remedy inasmuch as no "adequate administrative remedy" was available. 323 U. S., at 206–207. In *Vaca* it refused to find exclusive jurisdiction of unfair representation suits in the National Labor Relations Board, lest victims of union discrimination, owing to the Board's limited remedial powers, on occasion be left remediless. 386 U. S., at 182–183. And in *Vaca* it also refused to limit judicial relief to a decree compelling arbitration of the underlying grievance, reasoning that an arbitrator might lack power to award damages against the union, and holding instead that "the court should be free to decide the contractual claim and to award the employee appropriate damages or equitable relief." *Id.,* at 196. In *Vaca* and *Steele,* in other words, the Court held that a worker's remedies must *include* damages so that in all cases he would be fully compensated. But in neither case did it hold that the worker's remedies must *exclude* damages to the extent they rise above the full compensation norm. The Court has read into *Vaca*'s affirmative compensation policy a negative pregnant; it has transformed its liberal "compensation principle" into a parsimonious limiting rule; it has converted the floor beneath the injured employee's remedies into a ceiling on top of them.

*Vaca* and *Steele,* to my mind, contain no such negative pregnant. In *Vaca* the jury had awarded the worker both compensatory and punitive damages, 386 U. S., at 173; the Court held that "such damages are not recoverable from the Union in the circumstances of this case," *id.,* at 195, pointing out that "all or almost all" of the worker's damages were attributable to the employer, not to the union. *Id.,* at 198. *Vaca* stands only for the proposition that a union not chargeable with compensatory damages may not be taxed with punitive damages either. If *Vaca* contains any negative pregnant, it is that when a union *is* chargeable with compensatory damages, it *may* be taxed with punitive damages too. In *Steele,* the Court held that "the statute contemplates resort to the usual judicial remedies of injunction and award of damages." 323 U. S., at 207. This language, read in context, seems expansive to me. The Court now, by italicizing "usual," implies that punitive damages, being an extraordinary sánction, are an "unusual remedy," and hence outside *Steele*'s remedial compass. *Ante,* at 49. This reading is most strained. The Court's italics may make its point clear, but they do not make its argument correct, and they provide no substitute for a fairminded appraisal of what *Steele* says. Neither *Vaca* nor *Steele,* in my view, supports the negative "compensation principle" upon which the Court relies.

The Court's second reason for banishing punitive damages from the pantheon, closely related to the first, is that federal labor policy is "essentially remedial" and hence inhospitable to punitive awards. *Ante,* at 52. The Court cites two major cases to support this theory. Neither is apposite. In *Republic Steel Corp.* v. *NLRB,* 311 U. S. 7 (1940), the Court held that the Board cannot order punitive sanctions. But the question in that case was whether "Congress [had] conferred the power upon the Board to impose such requirements." *Id.,* at 10. The question, in other words, was simply one of the Board's statutory competence; the Court

decided that punitive sanctions were "beyond the Board's authority" and that it lacked "jurisdiction" to impose them. *Id.,* at 11, 13. *Republic Steel* has no pertinence here, since the federal courts have both the jurisdiction and the authority to impose punitive sanctions in their efforts to devise a federal law of remedies. In *Teamsters* v. *Morton,* 377 U. S. 252 (1964), the Court held that punitive damages may not be recovered in § 303 suits for damages from secondary boycotts. But *Morton* was a case of statutory construction. Section 303 expressly authorizes an employer's recovery only of "the damages by him sustained." 29 U. S. C. § 187 (b). "Punitive damages for violation of § 303," the Court reasoned in *Morton,* "conflict with the congressional judgment, reflected both in the language of the federal statute and in its legislative history, that recovery for an employer's business losses caused by a union's peaceful secondary activities . . . should be limited to actual, compensatory damages." 377 U. S., at 260 (footnotes omitted). Since Congress has expressed no such prohibition on punitive damages in unfair representation suits, *Morton* is simply inapposite here. Neither *Republic Steel* nor *Morton,* therefore, supports the Court's invocation of an "essentially remedial" theory in the fair representation area.

The third reason the Court gives in support of its *per se* rule is that punitive damages awards "could deplete union treasuries, thereby impairing the effectiveness of unions as collective-bargaining agents." *Ante,* at 50–51. It is true that *Vaca,* in enunciating its formula for apportioning damages in wrongful-discharge cases, said that "[i]t could be a real hardship on the union" to pay damages in certain circumstances. 386 U. S., at 197. But the Court was not talking about unions' fiscal soundness; one searches the opinion in vain for references to "depletion of union treasuries" or "impairment of union effectiveness in collective bargaining." What *Vaca* said was that it could be a real hardship to make

a union pay "damages attributable solely to the employer's breach of contract." *Ibid.* It is, obviously, a "real hardship" for anyone, regardless of his wealth, to be forced to pay money for something that was not his fault. And even if *Vaca* were read to evince concern for union treasuries, even in cases where the union *is* at fault, this concern would not support the Court's proscription of punitive damages where the union's fault is *egregious.* As the Court notes, *ante,* at 48, the damages a union will be forced to pay in a typical unfair representation suit are minimal; under *Vaca's* apportionment formula, the bulk of the award will be paid by the employer, the perpetrator of the wrongful discharge, in a parallel § 301 action. See 386 U. S., at 197–198. Union treasuries, in other words, will emerge unscathed in the general run of unfair representation cases. Given this, it can work no undue hardship on union fiscal soundness to permit punitive awards in those rare cases where the union has notoriously misbehaved.

The fourth theory underpinning the Court's *per se* rule is that "the prospect of punitive damages in cases such as this could curtail the broad discretion that *Vaca* afforded unions in handling grievances," and thus "could disrupt the responsible decisionmaking essential to peaceful labor relations." *Ante,* at 51, 52. The Court's theory seems to be that a union, fearing punitive damages, might become more vigilant in processing workers' grievances; that this vigilance might lead unions to process frivolous grievances; that this frivolity might antagonize the employer; and that this antagonism might beget disharmony at the bargaining table. This reasoning seems tenuous to me. Surely, the Court cannot believe that such airy speculations will induce union shop stewards to abandon all vestiges of common sense as they go about their diurnal chores. And even if the prospect of punitive damages did operate to chill a union's reason "in cases such as this," no Member of the Court is proposing to

award punitive damages "in cases such as this." Everyone agrees that punitive damages here were improper. The question is whether punitive damages are also to be outlawed in cases, unlike this one, where the union's conduct has been truly egregious. A little chilling of union "discretion" in *those* cases would not bother me.

## B

The Court's four proffered reasons in support of a *per se* ban on punitive damages thus leave me unpersuaded. I am not alone in feeling this way, for no Court of Appeals to consider the question has embraced the *per se* rule the Court today goes out of its way to adopt. As the Court observes, *ante,* at 45–46, the Fourth Circuit, followed by the Tenth in this case, has approved of punitive damages in unfair representation cases. *Harrison* v. *United Transportation Union,* 530 F. 2d 558, 563–564 (1975), cert. denied, 425 U. S. 958 (1976). The Eighth Circuit has expressed the view that punitive damages may be awarded where the union is guilty of "outrageous or extraordinary conduct." *Butler* v. *Teamsters Local 823,* 514 F. 2d 442, 454, cert denied, 423 U. S. 924 (1975). The Ninth Circuit, while barring punitive damages on the facts, restricted its holding to "grievances of the kind alleged" in the case. *Williams* v. *Pacific Maritime Assn.,* 421 F. 2d 1287, 1289 (1970). Even the Third Circuit, upon whose decision the Court relies to make out a Circuit conflict here, *ante,* at 45–46, declined to embrace the Court's *per se* approach, refusing to "decide whether any circumstances exist in which a punitive-type remedy . . . for union misconduct might be implied under the Railway Labor Act," and holding only that punitive damages were unavailable where (as in that case) no actual damages had been shown. *Deboles* v. *Trans World Airlines, Inc.,* 552 F. 2d 1005, 1019, cert. denied, 434 U. S. 837 (1977).

Equally instructive, in my view, are Court of Appeals cases upholding punitive damages awards in suits brought by workers against unions under the Landrum-Griffin Act. That Act outlines a "bill of rights" for union members, 29 U. S. C. § 411 (a), and provides that actions for violation of those rights may be had to recover "such relief (including injunctions) as may be appropriate." § 412. Every Circuit to consider the question has held that punitive damages are "appropriate relief" when a union's conduct manifests "actual malice or reckless or wanton indifference" to members' speech and associational rights. *Boilermakers* v. *Braswell*, 388 F. 2d 193, 199–201 (CA5), cert. denied, 391 U. S. 935 (1968); *Cooke* v. *Orange Belt Dist. Council*, 529 F. 2d 815, 820 (CA9 1976); *Morrissey* v. *National Maritime Union*, 544 F. 2d 19, 24–25 (CA2 1976); *Keene* v. *IUOE Local 624*, 569 F. 2d 1375, 1381–1382, and n. 8 (CA5 1978). These courts noted that punitive damages would serve a legitimate deterrent purpose in appropriate cases, *Braswell*, 388 F. 2d, at 200; *Cooke*, 529 F. 2d, at 820, and held that "[i]f punitive damages can be awarded against other defendants, they can be awarded against unions as well." *Morrissey*, 544 F. 2d, at 25. This reasoning, I think, is equally in point here. The Court properly reserves decision on Landrum-Griffin cases, *ante*, at 47 n. 9, but its pronouncements about "[t]he compensation principle," about the "windfall" nature of punitive damages, about the need to safeguard union treasuries, and about the "essentially remedial" quality of federal labor policy, all would seem to apply with equal force to § 412 suits, and they leave me uneasy. Although the Court professes willingness to draw hairline distinctions between different types of tort suits brought by workers against unions under federal labor laws, this willingness, in my view, only suggests how tenuous is the evidence of "congressional intent" on which the Court relies to back up its *per se* rule here.

## C

The Court of Appeals' unanimous refusal to erect a *per se* bar to punitive damages against unions, both in unfair representation cases and in Landrum-Griffin cases, seems judicious to me. If a union's conduct should reveal intentional racial discrimination, deliberate personal animus, or conscious infringement of speech and associational freedoms, I can discern no principle of federal labor policy that stands in the way of a punitive award. Punitive damages in such an exceptional case will serve at least to deter egregious union conduct, and *Vaca* makes clear that deterrence is a proper objective in unfair representation actions. See 386 U. S., at 187. If the Court feels obliged to devise some "careful balance of individual and collective interests" here, *ante,* at 48, the solution, in my view, is not to ban punitive damages across the board, but to restrict them to their proper sphere, namely, to those rare cases where the union's conduct can truly be described as outrageous.

For these reasons, I would hesitate to embrace the Court's *per se* rule even in a case that squarely presented that question for decision. What I find particularly hard to fathom is the Court's willingness to promulgate a *per se* rule here, where the pronouncement is manifestly unnecessary to decision. This case involves no racial discrimination, no trampling on workers' "bill of rights"; the record does not suggest—indeed, respondent does not even contend—that the union's conduct was motivated by personal hostility. For all this record shows, the union, in neglecting to act promptly on respondent's grievance, was simply following its standard operating procedure, a procedure admittedly inappropriate here, given the time constraints under which the union was operating, but a procedure for whose inappropriateness in this case respondent himself was at least partly responsible, since it was he who failed to notify the union until 52 days of the contract's 60-day limit had expired. The union's conduct, in

other words, was negligent or, at worst, grossly negligent. No court, to my knowledge, has ever held that negligence can form the basis for a proper punitive damages award. Especially should this be so in cases arising under the federal labor statutes.

To decide this case, in sum, the Court need hold only that the trial judge erred as a matter of law in submitting the punitive damages issue to the jury. Because the Court goes further and proscribes punitive awards in much more difficult and questionable situations, not presented here, I cannot join the opinion and I concur in the result only.