DENVER STEREOTYPERS AND
ELECTROTYPERS UNION,
LOCAL NO. 13, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Paul Simonette, Intervenor.

No. 78–1019.

United States Court of Appeals,
Tenth Circuit.

Argued May 14, 1979.

Decided June 9, 1980.

John A. Criswell of Criswell & Patterson, Englewood, Colo., for petitioner.

Jay E. Shanklin, Atty., N.L.R.B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., with him on brief), for respondent.

Sander N. Karp of Karp & Goldstein, Denver, Colo., for intervenor.

Before BARRETT, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

The Denver Stereotypers and Electrotypers Union, Local No. 13 (union or Local 13) appeals from a decision and order of the National Labor Relations Board (NLRB or Board), which ruled that the union committed an unfair labor practice, in violation of section 8(b)(1)(A) of the National Labor Relations Act, by breaching its duty to fairly represent Paul Simonette, the charging party. 231 N.L.R.B. 678 (1977). The Board has filed a cross-application for enforcement of the order.

In 1973 the union negotiated a multiemployer collective bargaining agreement covering stereotypers of The Denver Post, Inc. (Post) and the Denver Publishing Company (News), which publishes the *Rocky Mountain News.* The union was concerned that

technological changes could cause its members to lose their jobs as stereotypers. The parties agreed that they would negotiate the method of attrition and the employers would have the right to assign such stereotypers to other work. This agreement covered only regular situation holders (hereinafter referred to as full-time stereotypers) employed by the Post or the News as of February 26, 1971.

In 1975 the News acquired a printing process that did not require stereotypers and therefore discontinued its stereotyping department. On March 28, 1975, Simonette, having been employed by the News as a full-time stereotyper covered by the agreement, was assigned to a position in the street circulation department. Simonette then applied for membership in the Denver Newspaper Guild, which represented employees in that department, but he retained his membership in Local 13. On July 31, 1975, Simonette was discharged because prior physical injuries impaired his ability to do the street circulation work.

Simonette immediately contacted the Guild, but was told he had no recourse because he had not become a permanent employee in the street circulation department. On August 1, he apprised Paul Cavolt, president of Local 13, of the situation and requested that he, Simonette, be considered a stereotyper substitute on sick leave for the Post, which was still employing substitute stereotypers as needed, in addition to regular full-time stereotypers. Cavolt said he would refer the request to the union's hiring agent.

About August 15, Simonette informed Cavolt that he was now able to work and should be considered as a substitute stereotyper available for employment. Cavolt told him to contact the hiring agent, but mentioned that Simonette's priority might pose a problem that the union's executive board would have to consider.

The union dispatches substitutes from a list consisting of stereotypers not holding regular situations. The order of seniority on this list is based upon the date the substitute first worked as a stereotyper within the union's jurisdiction; this date is called a substitute's town priority. Simonette's town priority would have entitled him to the second highest position on the substitute list.

The executive board of the union met August 16 to discuss Simonette's placement on the substitute list, and voted to put him at the bottom. According to Cavolt the decision was based on the following considerations: (1) the stereotyping trade was dying; (2) giving Simonette priority was not fair to other substitutes because he had taken and lost the job he was guaranteed by the attrition agreement and that job was not available to any other stereotyper; and (3) the executive board believed the local and international union constitutions did not directly speak to Simonette's situation. When informed of the decision, Simonette was told the reason was his membership in the Guild.

The next week Simonette asked the president of the International to intercede; he refused, stating that he lacked the power to do so. Simonette then asked Dale Henry, vice-president and chairman of the board of the local union, to give him the reasons for the board's decision in writing. Henry agreed, but never did so.

Simonette thereafter obtained a sufficient number of signatures on a petition to call a special membership meeting to consider his plight. The meeting was scheduled and announced by a written notice posted on a bulletin board at the Post, but Simonette was not personally notified of the meeting and did not attend. Because Simonette was absent, the meeting was adjourned without discussion of his problem. Henry then telephoned Simonette, requesting him to withdraw the petition for a special meeting. When Simonette refused, Henry stated that one of the persons who had signed the petition had agreed, at Henry's request, to withdraw the signature.

On September 4 the local union executive board requested advice from the president of the International concerning this situation. The letter mentioned that the local board "felt that since he had another job

and was in another Union he had relinquished his town priority." The president of the International, by letter dated September 9, responded that he could not make a ruling on the subject at that stage. On September 17, a regularly scheduled union membership meeting was held. After the executive board explained the reasons for its decision, including Simonette's membership in the Guild, and after debate among the members, the membership voted to sustain the board's decision.

Simonette thereafter filed a charge against the union with the NLRB. After an evidentiary hearing, Administrative Law Judge Earldean V. S. Robbins concluded that the union had violated section 8(b)(1)(A) because its decision to place Simonette at the bottom of the substitute list was tainted by considerations of dual unionism. The Board, however, overturned this finding because dual unionism was not alleged in the complaint and the issue was not fully litigated; the union had therefore been deprived of due process. The Board nevertheless concluded that the union had breached its duty of fair representation in violation of section 8(b)(1)(A) because the union's "placement of Simonette at the bottom of the substitute list rather than in accordance with his town priority was contrary to the express language of Art. XV, Sec. 4, of its local constitution and in derogation of his clear contractual right under the collective-bargaining agreement." 231 N.L.R.B. at 681. The Board also found, as had the administrative law judge, that the union's "failure to notify Simonette of the special membership meeting, its attempt to pressure him into withdrawing his request to schedule another meeting, and its failure subsequently to schedule such a meeting was indicative of [the union's] bad faith" in placing Simonette at the bottom of the substitute list. *Id.* The union was ordered to cease and desist from the unfair labor practice, to make Paul Simonette whole for

any loss of wages or other benefits resulting from the practice, and to post an appropriate notice.

The union's petition in this Court raises several issues, including the Board's jurisdiction over an employee's complaint of breach of the duty of fair representation, exhaustion of internal union remedies, and a union's duty to represent an employee who is not a member of the bargaining unit. Because we conclude that the Board's decision is not sufficiently supported by the record, we do not address the union's other contentions and express no opinion on their merits. For purposes of disposing of this appeal, we assume the Board had jurisdiction.

█ The statutory duty of fair representation requires a union to represent employees in its bargaining unit "honestly and in good faith and without invidious discrimination or arbitrary conduct." *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 570, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). A "union breaches its duty when its conduct is 'arbitrary, discriminatory, or in bad faith' . . . ." *International Bhd. of Elec. Workers v. Foust,* 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979) (quoting *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967)).

█ The union's local constitution and bylaws[1] contain the following provisions with respect to priority on the substitute list:

Article XV, Section 4

Sub-Priority. A substitute's priority shall begin on the first day worked in the jurisdiction of Local No. 13. The sub with the oldest priority shall have first claim to the first five days available, the sub with the second oldest priority shall have claim to the second five days available, etc., through the remaining subs in the jurisdiction.

---

1. The collective-bargaining agreement does not expressly provide for substitute priorities, but does state that the general laws of the International in effect February 1, 1973, "shall govern relations between the parties to this agreement

on those subjects concerning which no provisions are made in this contract." Those laws permit the local to establish the priority rules. We assume that the local rules are therefore incorporated into the contract.

Article XV, Section 5
A journeyman situation holder losing and/or leaving his situation shall be placed on the sub priority list corresponding with the date of his first working in jurisdiction on current traveler or initiation.

The Board agreed with the administrative law judge's finding that article XV, section 5, did not clearly apply to Simonette, but decided that section four was clearly applicable. In essence, the Board reasoned that section four provides "unambiguously and absolutely" that a substitute's priority *shall* be his town priority. It apparently inferred arbitrariness or bad faith from the union's failure to treat Simonette in accordance with what the Board determined to be clear and unambiguous provisions. The Board's decision, however, does not focus directly upon the reasonableness of the union officials' view; instead, it seems to hold those officials to a standard of skill in interpreting legal documents akin to that possessed by the Board. This is error. In determining whether the union, acting through its officers and members, breached its duty of fair representation, the skill of the actors is relevant. Viewing the record as a whole in light of this principle, we believe the Board was not entitled to infer arbitrariness or bad faith.

The union here did not have a full-time bargaining representative or agent; all officers performed their duties in addition to holding jobs as stereotypers. That the officers believed sections four and five were not clearly applicable to the question of Simonette's placement is supported by their testimony, their reliance upon International rulings, *see* 231 N.L.R.B. at 684, and their September 4 letter to the International president. *See id.* The only evidence to the contrary is the inference to be drawn from the union officers' handling of the

special meeting requested by Simonette, discussed hereafter.

On its face, section four expressly treats priority accorded substitutes and speaks to the date upon which priority begins; it does not deal with the question of retained priority for substitutes who have left the trade. Article XX, No. 4, of the local constitution, which also deals with priorities, arguably applies only to full-time stereotypers and provides that they retain priority for six months.[2] Thus, the officers could reasonably conclude, as the record shows they did, that the constitution and bylaws were simply silent on the question of retained priority for substitutes.

In reaching the decision that the record does not provide substantial support for the Board's conclusion, we are influenced also by the administrative law judge's treatment of the provisions. She found that section five "is not clearly applicable" here. 231 N.L.R.B. at 686. Although she did not expressly treat the issue whether section four applied, that section is quoted in her opinion, and we think it apparent she did not consider it controlling. The nonprofessional union officers' decisions, which were in line with the view of an experienced and outstanding administrative law judge, should not be deemed arbitrary or in bad faith.

The Board also thought that the Union recognized section four applied when it placed Simonette on the substitute list, "albeit stripped of his priority." 231 N.L.R.B. at 681. This conclusion is dependent upon the Board's view that this section clearly applied to interrupted priority. That the officers recognized Simonette as a substitute, however, is entirely consistent with their view that these documents spoke only to the beginning date of a substitute's priority.

What about the union's attitude toward Simonette? The Board found the union

2.
### ARTICLE XX
#### PRIORITIES RETAINED

. . . . .

No. 4. Local No. 13 will retain priority for its members who are engaged in other gainful occupations for a period of six months.

Said members shall return to their situations at the expiration of six months or surrender all rights to their priority. Members who resume their situations at expiration of six months shall be ineligible to engage in other gainful occupations for a period of one year.

officers' failure to notify Simonette of the special membership meeting, their attempt to pressure him into withdrawing his request to schedule another meeting, and their failure subsequently to schedule such a meeting were "indicative" of bad faith. Does this make this a case of an ambiguous agreement where the union was influenced in its interpretation by animus toward Simonette? We do not think so. First, we do not understand the Board's finding on this matter to be an independent ground for its decision. It was made initially by the administrative law judge, who expressly noted that the finding was not sufficient by itself to support a breach. All of the administrative law judge's findings—except her interpretation of Art. XV, Sec. 4, and her reliance upon dual unionism as a basis for decision—were expressly approved by the Board. Considering the record purged of evidence showing union animus based on dual unionism, the Board's reasoning seems to be that since the relevant governing documents were clear and unambiguous, union action contrary to those documents necessarily was wrongful. If, as we decide, the documents are ambiguous, and we are not to consider the evidence on dual unionism, then the record does not contain substantial evidence of bad faith or arbitrariness.

Enforcement is denied and the order is vacated.

McKAY, Circuit Judge, dissenting:

This suit for breach of the duty of fair representation highlights the problem of too many tribunals reviewing administrative disputes. Since we cannot alter the number of tribunals involved, our most important task is to assure discipline in adherence to allotted review functions. It is difficult enough for us to divine from the cases how to supervise the allocation of fact-finding functions between administrative law judges and administrative tribunals without our becoming a third level of fact finders. It is not, therefore, the analysis of the union constitution and bylaws with which I disagree, but rather the proper procedural disposition of this case.

In this case union leadership interpreted the union constitution and bylaws against a union member's claim of substitute priority. He then made repeated attempts to have the decision reviewed according to prescribed procedures. The administrative law judge who saw the witnesses concluded that the officers' post-interpretative conduct in frustrating the member's attempts for review was in bad faith, but their interpretation was so patently correct that no bad faith in making the interpretation could be imputed. When the Board reviewed the record, it held a precisely contrary view of the proper interpretation of the constitution and bylaws. Its opinion does not make abundantly clear whether its finding of bad faith was based exclusively on what it believed to be an impermissible interpretation of the constitution and bylaws or whether it took some comfort from the administrative law judge's factual conclusion that the member's complaint was processed in a bad-faith manner.

I agree with the majority's conclusion that the constitution and bylaws are "simply silent" on the issue involved and that union officials could, in perfectly good faith, interpret them as they did. The interpretative decision standing by itself could not support a finding of bad faith.

What is left is the factual question of whether the officers' post-interpretative conduct (found by the administrative law judge to have been in bad faith) is sufficient to imply that, in opting for one of two permissible interpretations, the officers acted in bad faith toward this union member. Since both of the tribunals properly charged with fact finding found the constitution and bylaws clear on substitute priority, we simply do not know what factual conclusion they would have reached if they had viewed the constitution and bylaws as either ambiguous or silent. If we were at liberty to guess, the express finding of bad faith by the administrative law judge, followed by the Board's conclusion that bad faith existed, suggests the opposite result from that reached by the majority. Neither the majority nor I am able to say as a matter of

law that the post-interpretative conduct is either irrelevant to or unavoidably requires a finding of bad faith.

Since neither interpretation of the constitution and bylaws is clearly mandated, external evidence of bad faith in the processing of the dispute may, but does not necessarily, imply bad faith by the officers in interpreting the critical provisions of the governing rules. This sensitive factual judgment is quite properly left to the Board with the assistance of an administrative law judge. The proper procedure would be to return this case to the fact finders for a resolution of this question.