**Pete LE'MON, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 88–2833.

United States Court of Appeals, Tenth Circuit.

May 7, 1990.

Dan A. McKinnon, III, of Marron, McKinnon & Ewing, Albuquerque, N.M., for Petitioner.

Fred L. Cornnell (Rosemary M. Collyer, General Counsel; Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Barbara A. Atkin, Supervisory Atty., with him on the brief), N.L.R.B., Washington, D.C., for respondent.

Before SEYMOUR and BALDOCK, Circuit Judges, and SEAY,* District Judge.

SEYMOUR, Circuit Judge.

Pete Le'Mon, one of the employees represented by Sheet Metal Workers' International Association, Local Union No. 49 (Union), argues that the Union's failure to give the Federal Mediation and Conciliation Service (FMCS) timely notice of a labor dispute and the Union's subsequent encouragement of the illegal strike breached the Union's duty of fair representation, thereby constituting an unfair labor practice under section 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A) (1982) (NLRA). The National Labor Relations Board (NLRB) held that the Union did not commit an unfair labor practice. Le'Mon appeals, and we affirm.

I.

Aztech International, Ltd., is an Albuquerque company that manufactures low temperature electric radiant heating panels and multi-stage indirect/direct evaporative cooling units. All of Aztech's thirty-five production employees were covered by a collective bargaining agreement entered into on October 8, 1981, and effective until September 30, 1985. For several months prior to the contract's termination, the un-

ion engaged in negotiations with Aztech for a new agreement. At the same time, the Union conducted monthly meetings with the employees to discuss the status of the contract talks.

On July 30, 1985, sixty days prior to the expiration of the collective bargaining agreement, the employees voted unanimously (with a few abstentions) to authorize the Union to call a strike should the contract negotiations fail. On September 30, the Union met with the employees to discuss Aztech's final contract offer. Gary Briggs, the Union's business manager, presented the offer and expressed his displeasure with the failure to ban or limit subcontracting by Aztech, the random drug-testing clause, and the lack of wage increases. When asked by an employee whether he would sign this contract, Briggs responded that he would not. Briggs told the employees that their other option was to strike, but that by striking they risked being replaced. According to Briggs, being replaced was no different than being fired. The employees voted by secret ballot to reject Aztech's offer and the next day, October 1, they went on strike and began picketing.

The day the strike began, all the employees received a letter from Aztech's president, Bennett King, which stated that the Union's failure to give timely notice to the FMCS made the strike illegal, that all striking employees therefore were not protected by the NLRA from being fired, and that all striking employees were fired, effective immediately. King then offered to rehire the strikers as new employees if they filled out an application and underwent the standard interview and screening process. In addition to the letter, Aztech also filed an unfair labor practice charge against the Union.

Under section 8(d)(3) of the NLRA, 29 U.S.C. § 158(d)(3) (1982), the party desiring termination or modification of the collective bargaining agreement (here the Union) is required to give the FMCS notice of an

---

* The Honorable Frank H. Seay, Chief Judge, United States District Court for the Eastern District of Oklahoma, sitting by designation.

impending labor dispute within thirty days of notifying the other party of its wish to terminate or modify.[1] The Union concedes that it failed to meet this requirement because the letter mailed by the Union's attorney, Gerald Bloomfield, was dated September 11 and was received by the FMCS on September 17, well outside of the thirty-day deadline. Neither Briggs nor the Union's business representative, George Gilliland, was aware of this late notice.

Briggs and Gilliland learned of Aztech's contention that the strike was illegal, but initially they did not believe the allegation and were unable to confer with the Union attorney because he was out of town. When asked about Aztech's letter, the Union officials told the strikers that the company was simply trying to scare them and that the letter was a ploy to break up the strike. Briggs encouraged the strikers to stick together; if they maintained solidarity, he said, chances were good that the economic pressure would force Aztech to accede to the Union's demands and the strikers would regain their jobs. Briggs continued to urge the strikers to "stick together," even after the NLRB's Regional Office issued a complaint against the Union and after a newspaper printed a story on the illegality of the strike. By October 7, however, the strike was obviously disintegrating, and Briggs told the employees still out on strike that they should attempt to go back to work.

After the failure of the strike, the employees, upset with the Union's handling of the labor dispute, filed a decertification petition under section 9(c) of the NLRA, 29 U.S.C. § 159(c) (1982), in which they sought an election to oust the Union as the exclusive bargaining representative. When the Union received the petition, it disclaimed interest in representing Aztech's production employees.

## II.

Le'Mon's principal argument is that the Union breached its duty of fair representation by failing to give notice of a labor dispute to the FMCS within the prescribed time period and by encouraging the Aztech workers to continue with the illegal strike. Before considering Le'Mon's arguments, we note that the appropriate standard of review in labor cases requires that we must affirm the Board's decision if its findings are supported by substantial evidence on the record and if it correctly interpreted and applied the law. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Central Soya Co. v. NLRB*, 867 F.2d 1245, 1247 (10th Cir.1988); *NLRB v. Carbonex Coal Co.*, 679 F.2d 200, 203 (10th Cir.1982).

Le'Mon relies primarily on our decision in *Foust v. International Brotherhood of Electrical Workers*, 572 F.2d 710 (10th Cir. 1978) (*"Foust I"*), *rev'd on other grounds*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979) (*"Foust II"*), to support his argument that a breach of the duty of fair representation occurred. *Foust I* involved a radioman employed by the Union Pacific Railroad Company. The Union Pacific dismissed Foust following an on-the-job injury, and his attorney wrote to the appropriate officer of the union to get the discharge decision reversed. We stated that the union failed "to pursue the claim in question despite the fact that it had *full knowledge* of the 60-day limit [for filing the grievance]." *Foust I*, 572 F.2d at 716 (emphasis added). We noted that the union had delayed unnecessarily, sending letters back and forth between various union officials and insisting that "despite the shortness of time, ... Foust *personally* submit the claim to them." *Id.* Accordingly, we upheld the court's jury charge as a proper statement of the applicable law and affirmed the jury's determination that the

---

1. The purpose of the notice requirement is to "provide for a waiting period during which there can be no strike" and to enable the FMCS to try "to bring about a peaceful settlement." *Procter & Gamble Indep. Union v. Procter & Gamble Mfg.*, 312 F.2d 181, 188 (2d Cir.1962), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963); *see also* R. Gorman, *Labor Law* 425 (1976) ("it was clearly the intention of Congress to have the mediation agencies notified and given an opportunity to intervene in the bargaining prior to the use of economic weapons").

union had breached its duty of fair representation.

As the Supreme Court has held, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967); *see also Foust II*, 442 U.S. at 47, 99 S.Ct. at 2125; *Woods v. North Am. Rockwell Corp.*, 480 F.2d 644, 648 (10th Cir. 1973); *Reid v. International Union, United Auto. Workers*, 479 F.2d 517, 520 (10th Cir.), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 592, 38 L.Ed.2d 483 (1973). Such conduct includes, for example, situations in which a union "arbitrarily ignore[s] a meritorious grievance or process[es] it in perfunctory fashion." *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917. We held in *Foust I* that the union's handling of the grievance was done in a perfunctory manner, and Le'Mon urges us to find that the failure of the Sheet Metal Workers' Union to give the FMCS timely notice was done in a similarly "perfunctory fashion."

Both *Vaca* and *Foust I* involved a union's handling of an *individual* union member's grievance, while in the present case the union's negligent conduct affected *all* its members. This distinction is a significant one, as an analysis of the duty of fair representation reveals, and is one that precludes recovery in the instant case.

The duty of fair representation, a duty which predates the prohibition on union unfair labor practices in the 1947 amendments to the NLRA, is a statutory obligation that "has 'judicially evolved' as part of federal labor law." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, — U.S. —, 110 S.Ct. 424, 432, 107 L.Ed.2d 388 (1989) (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971)). The Supreme Court first recognized the duty in a Railway Labor Act case. *See*

*Steele v. Louisville & N.R.R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). In *Steele*, the Railroad had removed five black firefighters, previously assigned to a highly desirable "passenger pool," and replaced them with white firefighters. The Railroad was acting pursuant to a new collective bargaining agreement it had negotiated with its employees' bargaining representative, the Brotherhood of Locomotive Firemen and Enginemen. This union, which by its constitution excluded all blacks from membership, had initiated the negotiations because it "desire[d] to amend the existing collective bargaining agreement in such manner as ultimately to exclude all Negro firemen from the service." *Id.* at 195, 65 S.Ct. at 228. The resulting racially discriminatory agreement formed the basis of the suit against the union and the Railroad.

In analyzing the black firefighters' claim, the Supreme Court acknowledged the statutory right of the majority of any craft to choose its representative responsible for collective bargaining with the employer. But the Court rejected the argument that Congress therefore "intend[ed] to confer plenary power upon the union to sacrifice, for the benefit of its members, rights of the minority of the craft, without imposing on it any duty to protect the minority." *Id.* at 199, 65 S.Ct. at 230. If the union did not owe some duty to represent the minority, the Court reasoned, then minority members "would be left with no means of protecting their interests, or indeed, their right to earn a livelihood by pursuing the occupation in which they are employed." *Id.* at 201, 65 S.Ct. at 231. The Court held that "[s]o long as a labor union assumes to act as the statutory representative of a craft, it cannot rightly refuse to perform the duty, which is inseparable from the power of representation conferred upon it, to represent the entire membership of the craft ... without hostile discrimination, fairly, impartially, and in good faith." *Id.* at 204, 65 S.Ct. at 232.[2]

---

**2.** Although *Steele* was a Railway Labor Act case, the Supreme Court later held that the duty of fair representation applied equally to National Labor Relations Act cases. *See Ford Motor Co.*

*v. Huffman*, 345 U.S. 330, 337, 73 S.Ct. 681, 685, 97 L.Ed. 1048 (1953); *see also Vaca*, 386 U.S. at 177, 87 S.Ct. at 909; *Foust II*, 442 U.S. at 46 n. 8,

As the duty-of-fair-representation doctrine has evolved, its function as the protector of minority and individual employee rights, whether in collective bargaining or in the handling of grievances, has been emphasized consistently. *See Vaca*, 386 U.S. at 182, 87 S.Ct. at 912 ("the duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against *individuals* stripped of traditional forms of redress by the provisions of federal labor law") (emphasis added); *Breininger*, 110 S.Ct. at 432 (the duty "is an essential means of enforcing fully the important principle that 'no *individual* union member may suffer invidious, hostile treatment at the hands of the majority of his [or her] coworkers'" (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971))) (emphasis added); *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 2290 n. 14, 76 L.Ed.2d 476 (1983) (the duty exists to ensure that "*individual* employees are not ... deprived of all effective means of protecting their own interests") (emphasis added); *Foust II*, 442 U.S. at 46–47, 99 S.Ct. at 2124–25; *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976).

Unlike these Supreme Court cases and unlike *Foust I*, the injured party here is not an individual or group singled out for treatment different from that accorded the majority, but the entire class of Aztech employees represented by the Union.[3] This, then, is not a situation in which a minority would be deprived of any remedy were it not for the duty of fair representation. Here, the Aztech employees had a remedy against the Union for the harm caused by the Union's negligence and they used that remedy: they petitioned for an election to oust the Union as the exclusive bargaining representative. This powerful remedy of ouster, available to the employees by virtue of their majority status, ensures that a union will have the proper incentives to represent the employees "without hostile discrimination, fairly, impartially, and in good faith." *Steele*, 323 U.S. at 204, 65 S.Ct. at 232.

Despite the availability of the ouster remedy, Le'Mon nevertheless urges us to view the duty of fair representation as one which creates a kind of fiduciary obligation owed by the Union to *all* those it represents. The Supreme Court, however, has never conceived of the duty of fair representation in such a broad way.[4] To the

---

99 S.Ct. at 2124 n. 8. *Foust I* also arose under the Railway Labor Act.

**3.** Le'Mon observes that the Union and an El Paso, Texas, firm with considerably more Union-represented employees had entered into a collective bargaining agreement containing a "most-favored-nations" clause which provided that "there shall not be a more favorable contract offered to any competitor of the employer in the jurisdiction of Sheet Metal Local No. 49." Rec., vol. II, C.P. ex. 1, art. XX. Le'Mon then argues, inconsistently, that this El Paso contract induced the Union to strike to get wages comparable to those in the El Paso firm, *and* to file a late notice in order to make the strike illegal. The ALJ found that the El Paso contract was not "a legitimate consideration here" since Albuquerque and El Paso are a distant 270 miles apart, too far to be a factor to the Union. Rec., vol. III, doc. 1, at 12 n. 8. The ALJ also noted that if the Union's object was to abandon the Aztech employees to save the El Paso contract, it did not need the excuse of an untimely notice.

Because we conclude there is sufficient evidence to support the ALJ's factual conclusions, we need not address whether the entire group of

Aztech employees constituted a discriminated-against minority vis-a-vis the El Paso majority.

**4.** In a recent case involving the right to a jury trial in duty-of-fair-representation cases, Justice Marshall, writing for four members of the Supreme Court, stated that "[j]ust as a trustee must act in the best interest of the beneficiaries, a union, as the exclusive representative of the workers, must exercise its power to act on behalf of the employees in good faith." *Chauffers, Teamsters & Helpers, Local No. 391 v. Terry,* — U.S. ——, 110 S.Ct. 1339, 1346, 108 L.Ed.2d 519 (1990) (citation omitted). Justice Marshall reasoned that "just as a beneficiary does not directly control the actions of a trustee, an *individual* employee lacks direct control over a union's actions taken on his [or her] behalf." *Id.* (citation omitted) (emphasis added). Justice Kennedy, writing for two other justices, also found the trust analogy helpful in assessing the right to a jury trial, but he was careful to limit the breadth of this analogy and to emphasize that he did not wish to "imply that a union acts as a trustee in all instances or that trust law, as a general matter, should inform any particular aspects of federal labor law." *Id.* 110 S.Ct. at 1357.

contrary, the courts' role in assessing union actions in duty-of-fair-representation cases is generally analogized to the "special scrutiny" courts must apply when analyzing legislative actions under the Equal Protection Clause. As the Supreme Court noted in *Steele:*

> "[T]he Railway Labor Act imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body ... but it has also imposed on the representative a corresponding duty."

*Id.* at 202, 65 S.Ct. at 232; *see also* Gorman, *Labor Law* at 716 ("the democratic process within the union has induced ... courts to accord special scrutiny to decisions which worsen the job status of workers whose only common characteristic— while not as invidious as their color, sex, or national origin—is their minority status within the union"); Harper & Lupu, *Fair Representation as Equal Protection*, 98 Harv.L.Rev. 1211 (1985); ALJ Opinion, rec., vol. III, doc. 1, at 7 ("the [union-employee] relationship requires only that the statutory representative provide equal protection to the employees it represents").

For these reasons, the Sixth Circuit has declined "to extend the duty [of fair representation] to cover a situation ... where a member or group was not singled out for different treatment." *NLRB v. Local 299, Int'l Bhd. of Teamsters*, 782 F.2d 46, 51 (6th Cir.1986). The alleged breach of duty in *Local 299* included the union's failure to inform the employees that the company viewed them as engaging in an illegal work stoppage in violation of the contract. The court specifically rejected the argument

that a fiduciary duty between a union and all its represented employees existed, and it held that "the duty of fair representation is implicated only when an individual or group is. treated differently ... than another individual, group or the collective." *Id.* at 51–52.

Because the concerns which prompted the Supreme Court to develop a duty of fair representation are not present in this case, we decline to extend the duty to situations in which the injury suffered is common to the majority of represented employees. Holding as we do that the union's duty of fair representation was not implicated in this case, we need not address the other contentions raised by Le'Mon.

The order of the NLRB is affirmed.

This case, of course, is factually distinct from the situation which prompted Justice Marshall to draw the trust analogy. Although an individual employee may share many of the same characteristics as a relatively powerless beneficiary, a majority of represented employees, with the power to decertify a union, has little in common with the traits Justice Marshall ascribed to a trust beneficiary. Therefore, while some members of the Supreme Court would impose a kind of fiduciary duty on a union vis-a-vis individual employees, no justice has suggested a broader duty with respect to *all* of the represented class of employees.