Hope FISHER, Plaintiff,

v.

The FASHION INSTITUTE OF TECH-NOLOGY; Gladys Marcus, Individually and as Associate Dean of the Department of Liberal Arts; Fashion Institute of Technology Local 1460 (Fashion Institute of Technology Chapter) of the United Federation of College Teachers; Local 3457 United College Employees; George Levinson, Individually and as the Former Chairman of the Grievance Committee of Local 1460 of the United Federation of College Teachers, and as Chairman of the Grievance Committee of Local 3457 of the United College Employees, Defendants.

No. 78 Civ. 971.

United States District Court,
S. D. New York.

March 28, 1980.

Silvera & Brooks, New York City, for plaintiff; Agostinho Dias Reis, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants Fashion Institute of Technology and Gladys Marcus; Jonathan D. Warner, New York City, of counsel.

James R. Sandner, New York City, for defendants George Levinson and United College Employees; Susan Bloom Jones, New York City, of counsel.

## OPINION

SOFAER, District Judge:

This action was brought under several statutes, but plaintiff abandoned before trial any claim for relief other than that based on Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e, *et seq.* Plaintiff is a black woman, who claims she was refused promotion by or on account of the racially discriminatory acts of defendants. The defendant Fashion Institute of Technology (FIT) is a publicly-supported community college sponsored by the Board of Education of the City of New York, providing specialized education in the field of fashion and design. Gladys Marcus is Dean of FIT's Department of Liberal Arts. FIT Local 3457 (formerly Local 1460) of the United Federation of College Employees is an employee union at FIT (Tr. 358), and George Levinson was Chairman of the Local's Grievance Committee when plaintiff complained to it concerning FIT's denial of a promotion.

The trial in this case commenced on August 7, 1979 and continued through August 10. Decision was reserved, not because the case is close on the merits, but because the action seemed so patently frivolous that defendants' request for counsel fees warranted careful consideration. On the basis of the entire record and the governing law, judgment is hereby rendered for all defendants, and the parties are ordered to submit information necessary to ascertain the amount of fees and costs incurred by defendants that should be charged to plaintiff

or her attorney. The following opinion constitutes the findings and conclusions upon which these judgments are based.

## I. The Claim of Racial Discrimination

█ Plaintiff began working for FIT in 1967, as part of a federally funded High Horizons program. On or about December 7, 1967, she was placed on the FIT payroll as a clerk-typist, because FIT personnel feared the federal program would terminate and she would lose her job. (Tr. 13, 15) Her work as a clerk typist was apparently satisfactory, and she was promoted in or about September 1970 to Department of Secretary, Liberal Arts Division. Plaintiff worked during that period under defendant Gladys Marcus, the Chairperson of Liberal Arts, who undoubtedly was responsible for plaintiff's promotion. (Tr. 20)

Plaintiff insists that, from 1970 to 1973, she performed her varied duties as Department Secretary with imagination, initiative, and competence. (Tr. 50–51; 53–61) On June 21, 1973, she wrote a memo asking that her job be "reclassified" (and upgraded) to Administrative Secretary. (PX–1) She claimed she was already doing the work of an Administrative Secretary, that she was "dedicated," and that she believed such a classification was available. (Tr. 21–22, 27–28) Furthermore, she stated at trial that, between 1970 and 1973, she "used to see to it that I met with all the chairpersons at least once a month to find out if there were any criticisms or anything they wished I improved on or anything that was lacking and all my reports I got back were very favorable. Most things were very minute." (Tr. 30) Among the chairpersons she met with "monthly" was Gladys Marcus, and plaintiff recalled no "negative comments addressed to the performance" of her duties. (Tr. 31) She also claimed she could recall no oral criticism of her work by Marcus or any other chairperson between June 1973 and December 1974. (Tr. 32) Indeed, plaintiff testified that she could recall no criticisms of her work by chairpersons "through June of 1976," or in fact to the time of trial. (Tr. 33–34, 67–68)

Plaintiff's testimony must be weighed, first, in the light of a written memorandum to her from Dean Marcus, dated March 26, 1974. (DX A) It begins by informing plaintiff that a decision had been made "not to fill the position of Administrative Secretary at this time," essentially because plaintiff was presently unqualified for the position and to open it "at this time" would deprive plaintiff "of the opportunity to improve your performance." The letter noted a recommendation to add a clerk-typist to the Department's staff, to make for a more efficient operation and to reopen the subject of Administrative Secretary within one year. The memorandum explicitly criticized the level of plaintiff's work, particularly her typing, productivity, lack of follow-through, and misallocation of her time (DX A):

> You were considered for the open position of Administrative Secretary. However the present standard and quality of your work does not merit a promotion to the more demanding position of Administrative Secretary.
>
> The general appearance of your work is often not good enough and the accuracy and speed of the typing is not up to a high standard.
>
> The level of productivity is questionable. Too frequently work is not completed in a reasonable length of time. For several years it has been observed that when faculty members need something done with dispatch and accuracy, they turn to the other typist. Perhaps a better organization of the work is necessary.
>
> It was noted that there is not a consistently dependable follow-through of assigned tasks. It should not be necessary for us to inquire whether or not jobs have been thoroughly completed.
>
> For the most part your relationship with the faculty has been cooperative. You have given your time generously to the students, but not always judiciously. As a result the efficiency of your work has been affected.
>
> Finally it wasn't always evident that as a department secretary you made a good division of working time and allocation of responsibilities.

In view of the above the decision is as stated.

Plaintiff contends, in effect, that this letter is a lie, an after-the-fact concoction, designed to frustrate her well-deserved promotion. She felt "dehumanized" by it, as though she were "nothing," she said, and she demanded that all the chairpersons actually sign the memorandum. (Tr. 130–32) This they all proceeded to do, and several of them testified at the trial in support of the conclusions they reached.

Dean Marcus pointed out, first, that plaintiff's promotion to Departmental Secretary in 1970 was granted despite "very average" performance. In particular, plaintiff's typing was inaccurate, and she was too often late or absent. Marcus testified that she and the other chairpersons discussed these misgivings with plaintiff. (Tr. 382–83) She said that another candidate was available for the job—Ruth Venopal—whom they concluded was "Excellent." Nevertheless, as Ms. Venopal's March 4, 1970 evaluation specifically recites: "We gave the preference to Hope Fisher who has been with us for some time." (DX–O; Tr. 386–87) At the same time, plaintiff was given preference by Dean Marcus over an applicant named Jane Albert, whom plaintiff claims, without basis, was later favored over her. (PX–28) The problems with plaintiff's performance continued from 1970 to 1974, according to Marcus. Ms. Fisher was frequently late, particularly at lunch times, and she was deficient in "fundamental skills." (Tr. 395–98)

When a reorganization created the new position of Administrative Secretary to the Division, and plaintiff sought what she inaccurately calls "reclassification," [1] Dean Marcus met with the other chairpersons and they unanimously concluded that plaintiff was unqualified. Marcus says she met with plaintiff, explained this position to her, and offered to have plaintiff meet with the others who had considered plaintiff's qualifications. Plaintiff did not avail herself of this opportunity. Therefore, the chairpersons decided to write a memorandum stating their reasons. After a rough draft of March 13, 1974, the memorandum of March 26, 1974 was prepared and signed by all those involved, at Ms. Fisher's request.

Three chairpersons testified and confirmed Dean Marcus' testimony concerning plaintiff's pre-1974 performance. Jean-Ellen Giblin, Chairperson of the Social Service Department since 1973, said that she had returned inadequate work to Ms. Fisher prior to 1974 on "several occasions." She voted against giving Ms. Fisher the job of Administrative Secretary because of plaintiff's inaccurate work, errors, sloppy corrections, and lateness. (Tr. 514–16) Evelyn Stephens, Chairperson of the Science Department since 1971, said the explanation for her 1974 decision was that "Hope's typing was never any good, it is very simple." Ms. Fisher was also late, lacked follow-through, and had excessive absences. She had frequent discussions with plaintiff concerning these problems at the time. She recalled in particular that plaintiff's lateness "caused havoc in my office." (Tr. 537–38, 544, 562–63) Dewayne Peterson, Chairperson of the English Department as of January 1974 (see Tr. 577), also concurred in this evaluation, stressing plaintiff's "basic lack of adequacy as a typist," even when copying from typed manuscript. He, too, recalled telling plaintiff her work was inad-

---

1. Plaintiff sought during the trial to establish that her job as Department Secretary had been reclassified to Administrative Secretary, arguing in effect that she was entitled to the new job since she was already performing its duties. Ms. Fisher in fact sought to have her job reclassified in 1973, but that is the only evidence supporting her contention. Dean Marcus explained that four Administrative Secretary jobs were created in January 1974, as part of a reorganization, in order to provide each associate dean with a top level secretary. (Tr. 389–

91) Moreover, FIT job descriptions for Department and Administrative Secretaries differ in several significant respects. (PX–23) It is hardly surprising that counsel for plaintiff signed a pretrial order stipulation that plaintiff had asked in 1973 that her position be "upgraded" to Administrative Secretary, and that no such position existed in the Liberal Arts Department until January 1974, when it was created. Pretrial Order ¶ 3(a)(3)–(5). Plaintiff disavowed these stipulations at trial, but failed in any event to prove they were untrue.

equate. (Tr. 571) All four of these witnesses expressly, and convincingly, affirmed that race played no part in their decision to decline Ms. Fisher's request for promotion in 1974, or in any other of their actions. (Tr. 394–95, 516, 541, 571)

In light of this testimony, and a specific and telling example of pre-1974 typing failures (DX–B), plaintiff's testimony that no one ever complained about her work is incredible.[2] Furthermore, in responding to questions concerning her deficiencies during that period, plaintiff was evasive and untrustworthy. For example, when asked about her lateness, she at first avoided the issue, and then admitted to being late a few times. (Tr. 186–89) Further questioning revealed that plaintiff had a far more flexible attitude toward her lunch hour than the persons who relied upon her for secretarial services. "I wasn't a clock-watcher," she observed. (Tr. 190) When asked about her attendance, she expressed her first of many, many failures of recall, and finally admitted only occasional absence. (Tr. 191) She claimed to have had no problems with typing, but when asked about excessive use of white-out she failed to recall. (Tr. 192) When confronted with an example of her typing inadequacy, on which a written complaint from Dean Marcus appeared (DX–B), plaintiff said only "I could have typed it." When directed to the letters "HF" on the exemplar, indicating the typist's initials, she said: "HF could be Hope Fisher. It could be Helen Feinberg. It could be a lot of people." But when asked if anyone named Helen Feinberg worked at FIT, plaintiff said no, and she eventually conceded that she was indeed the "HF" on this and other letters. (Tr. 195–96)

Plaintiff testified that she had monthly meetings with the chairpersons for whom she worked until about June 1973, but claimed these were not set up to inform her of any problems with her work. (Tr. 203–04) She conceded that a meeting had been set up in March 1974 to speak to the persons who unanimously agreed she should not be promoted, that the meeting was cancelled at her request, and that no further appointment was made. (Tr. 208–09) She could not recall telling anyone then that she had been discriminated against on the basis of race. (Tr. 209) In fact, her testimony on when she first felt discriminated against is instructive. She claims that she first realized discrimination existed when she saw that Dean Marcus would not support her promotion, and when she received the March 1974 memorandum. (Tr. 125–27, 132, 286) This reaction was undoubtedly the result of genuine pain at being informed so definitively of her inadequacies. (See Tr. 151–52) But to support her accusation she could provide nothing more than her "gut feelings," first perceived only after seven years at FIT, and a general and untenable claim that FIT discriminated against other blacks.[3] (Tr. 155) In fact,

2. Plaintiff also testified that she spoke personally to Dean Marcus in November 1973, asking for the Dean's help in securing a promotion. She clearly received the impression that Dean Marcus had no intention of helping her. (Tr. 121) Plaintiff apparently began preparing what is designated a "BRIEF" after that November conversation with Dean Marcus in which she wrote she was orally advised that "there had been negative criticisms and valuation" about her. Not only does this exhibit, DX–N, show plaintiff was informed of the chairperson's views, it is typed with numerous errors.

3. Plaintiff was permitted at the trial to attempt to prove that FIT or the other defendants discriminated on the basis of race. A broad subpoena seeking information on this issue was served by plaintiff's counsel during the trial, after months of discovery time during which no such material was sought. The materials submitted in response include numerous memos, plans, hiring efforts, and projects by FIT personnel to achieve affirmative action. (PX–25, 26 & 34) The only proof of discrimination was in complaints filed by Roy P. Daniels, claiming that he had been unlawfully denied promotion to Associate Professor and later to Professor. The claims made by Daniels led to a recommendation by the NYDHR that he be promoted to Associate Professor, which was accepted by FIT; and to a finding of probable cause as to his non-promotion to Professor. The latter dispute was ultimately submitted by both parties for decision by a panel headed by Magistrate Sol Schreiber. The panel decided, 2 to 2, against Daniels, finding him less qualified than the others promoted. (DXL–5, hereby received on motion of defense counsel)

when asked why she regarded the March 1974 memorandum as evidence of racial bias, she said the memo did not merely criticize her work, it dehumanized her and made her into "nothing." (Tr. 152–53, 248) However indignant plaintiff might have felt after reading the memorandum, that memorandum, reciting only her deficiencies as a secretary, tends to refute rather than support her claim of racial discrimination.

Plaintiff's credibility was further eroded by her testimony concerning the decision by Dean Marcus and the chairpersons to hold open the Administrative Secretary position for one year. The March 1974 memorandum itself made clear that Ms. Fisher was to be given a year to improve her performance. Dean Marcus and the other chairpersons testified, moreover, that several measures were adopted to ensure that plaintiff would be able to prove herself without excessive burdens or interference. (Tr. 409–10, 571) Thus, plaintiff's desk was moved away from the door to the office in which she worked, so she would not have to deal with persons who needed information and help; and an additional typist was hired to work for the faculty, allowing plaintiff to work exclusively for Dean Marcus and the other chairpersons. These changes, Dr. Peterson testified, were made in response to plaintiff's "plea." (Tr. 571)

Plaintiff denied the very notion of a test period. The extra person hired at the time was not to help her, she claimed, but just part of the new "structure." (Tr. 211) Had she told Dean Marcus she was overloaded? She could not recall. Had her desk been moved? She could not recall. Had her work conditions been changed? She could not recall. Had she stopped working then for the faculty? She could not recall. And had these changes been made to facilitate a fair review of her work from 1974 to 1975? She insisted her work had been adequate and therefore no need

existed for such a test period; but then she claimed she did not know. (Tr. 211–17) Ultimately, on redirect, she conceded some changes may have been made to enable her to prove herself. (Tr. 287)

One year after the March 1974 memorandum, in March or April 1975, Dean Marcus and the other chairpersons met to decide finally whether plaintiff should be given the job she sought. (Tr. 412) All agreed that plaintiff's work had shown either no improvement or insufficient improvement to warrant her promotion. (Tr. 412, 516–17, 539, 575) Dean Marcus and the others all based their decision on continued lateness, lack of follow-through, and inadequate typing. (Tr. 395, 399) Chairpersons Peterson, Stephens and Giblin each wrote a memorandum to Dean Marcus during March or April 1975 detailing their numerous and weighty reasons for recommending against plaintiff's promotion. (DX–P, Q & R) Several examples of plaintiff's post-March 1974 work were introduced, showing poor appearance, mistakes, and sloppiness. DX–C through L) An attempt to have plaintiff take and transcribe the minutes of a meeting led to several complaints at the subsequent meeting that the minutes had been inaccurate. (See DX–M; Tr. 408) Plaintiff's counsel sought to establish that the examples introduced of plaintiff's inadequate work had been carefully collected and preserved, and that they may have been unrepresentative. But this effort was unconvincing (see Tr. 399, 523–24, 619), and at least one witness offered to search her files and produce other examples, an offer which plaintiff's counsel declined. (Tr. 546)

Plaintiff's testimony concerning the period between March 1974 and April 1975 put to rest any lingering doubt that may have existed concerning the fairness of her treatment. Asked whether she had received complaints concerning her work, she said she did not recall. (Tr. 217, 223) Indeed,

---

The Daniels case, whatever its merits, is the only instance of claimed discrimination in which even a colorable case was presented. It is incomparable to Ms. Fisher's claim, which totally lacks foundation. The only reported case of discrimination involving FIT was filed by a Jewish woman alleging she was refused a job and discharged because of her religion, sex and age. Judge Pollack found the claim meritless in a reasoned and convincing opinion. *Leiman v. FIT*, 441 F.Supp. 854 (S.D.N.Y.1977).

despite the existence of the March 1974 memorandum, plaintiff insisted she had never been "told" that she was unqualified. (Tr. 295–96) On being confronted with at least four examples of her poor typing, she could not recall them, or discussions concerning them. (Tr. 218, 220, 221, 223) Finally, and with obvious reluctance, she conceded only this much: "People make mistakes. Maybe I made them once in a while; I don't recall." (Tr. 224) When asked if she had taken minutes of a meeting, as part of a shorthand competency test, she at first asserted that taking minutes was not her job. Later, she conceded that "she may have," and later still that the minutes were part of a test. (Tr. 225, 292–93) Asked about a shorthand test she took at the personnel office, she concentrated on objecting to Dean Marcus having seen the test, claiming it could only have been obtained improperly from her confidential personnel file. (Tr. 237–38)[4] Later, she claimed she could not even recall the purpose of the test. (Tr. 306)[5]

Plaintiff's counsel sought to show that Ms. Fisher met the objective criteria for the job she sought. He proved that she could type faster than the minimum speed required, and had met the Personnel Office's minimum standard in shorthand, also apparently a speed evaluation. (Tr. 460) As Dean Marcus made clear, however, speed was not the basis on which she considered plaintiff inadequate. (Tr. 471) Furthermore, she identified several requirements in the relevant job description that plaintiff failed, in her judgment, to meet, all of which amply justify her conclusion that plaintiff's performance was inadequate. (Tr. 471–89; see PX–5, p. 24; PX–23)

Plaintiff proved that she spent a considerable amount of time helping students (usually black), that she often stayed over-

---

4. Dean Marcus denied the allegation, and plaintiff's counsel did not pursue the issue further.

5. The following colloquy then occurred, and illustrates plaintiff's evasiveness and incapacity to deal with the fact that she had been critically evaluated (Tr. 306–09):

BY MR. WARNER:

Q Miss Fisher, in April of 1974 when your desk was moved and your assignments changed, did anyone tell you why that was being done?

A I don't recall.

Q You don't recall?

THE COURT: That is what she said.

Q Didn't Dean Marcus tell you specifically that the reason your desk was being moved was because you were only going to work for her and the three chairpersons and they would be able to evaluate your performance during the year, that the administrative secretary position was going to be held open?

A They had to change—

THE COURT: The question is: Do you recall her specifically telling you that?

THE WITNESS: I don't recall specifically, no.

Q Do you recall her telling you anything about that?

A I recall the fact that they had hired another clerk-typist and I was the senior member in the department. Therefore there was a clerk-typist and another clerk-typist and I was department secretary and there were four chairpersons.

That would have been part of my change of job because that is the way it had to be.

THE COURT: I find that a very evasive answer.

The question was whether you recalled Mrs. Marcus telling you anything about her purpose, if any, concerning these changes in your job.

If you recall nothing about her telling you any of this; if you recall her saying nothing about it, you may say so.

Do you recall her making any statements to you in respect to her intentions in making those changes, or in keeping the job open for a year as a test period?

A She may have told me, yes, now that I think back.

Q She did tell you?

A It is possible she did.

Q And she told you specifically that the job was going to be held open a year to see if you could fill the position?

A I was already qualified, yes.

Q No, Miss Fisher.

The question was whether or not the job was going to be held open a year and the other chairpersons would be able to evaluate your performance.

A I don't know if she told me that specifically, no. I don't recall her telling me that specifically, no.

Q She did tell you specifically that the job was going to be held open a year?

A She may have written it to me in that memo. I don't recall her telling me specifically, word for word, face to face.

time, and that she engaged in some constructive community activities. (Tr. 159–79, 525) The evidence also showed, however, that Dean Marcus had opposed plaintiff's helping any students, black or white, because plaintiff's kindnesses to students interfered with her work. Furthermore, Dean Marcus testified that she had expressly instructed plaintiff not to work overtime, and plaintiff in fact performed no official work at those times. (Tr. 492–93) Finally, plaintiff was at no time faulted for her community activities; Dean Marcus regarded one such activity as particularly commendable. Nevertheless, defendants could properly conclude, as Dr. Peterson testified, that useful community work is no substitute for adequate performance on the job. (Tr. 495, 580)

Having been denied promotion in March 1974, plaintiff invoked the grievance mechanisms at FIT. She contacted the union's Grievance Committee through its chairperson, defendant George Levinson, an Associate Professor at FIT. She complained about the memorandum she had received, arguing that it was inaccurate and unexpected. (Tr. 667) Also she claimed discrimination on the ground that, while two other department secretaries had been made administrative secretaries, her department had refused to select her as its administrative secretary. Race was not part of her claim. (Tr. 668) Professor Levinson looked into the complaint and advised plaintiff of his opinion that nothing in the contract had been violated, since she had in fact been considered for the position. Plaintiff asked to see the Grievance Committee, and a meeting was arranged on or about April 23, 1974, at which she stated her case for 30 to 45 minutes. (Tr. 669–70) Although plaintiff claims she then believed that racial discrimination was the crux of her complaint, she concedes that she did not mention race at that time; Levinson also heard no mention of race. (Tr. 266, 671)

The Committee assumed Ms. Fisher had concluded her complaint, because it went on the next day to hear Dean Marcus, and then to vote (6 to 1 with an abstention) to refuse to represent plaintiff in pursuing the grievance further. (Tr. 672–73) Ms. Fisher testified that she felt she was not finished with her presentation, and that she reappeared the next day and was denied admission. But she never sought a further hearing, did not respond to the Committee's memorandum "denying" her grievance (PX–18), and did not pursue the grievance to the next step, as the Committee and Levinson made clear was her right. (Tr. 273–76, 673) Significantly, when Ms. Fisher sought further reasons for the Committee's action, she received a memo setting forth its reasons. (Tr. 672–74; PX–19) Had she asked for an additional hearing, the Committee would presumably have granted that request as well. Plaintiff's legal theory for how the union discriminated against her is also frivolous. It is based on the untenable premise that the union is compelled to represent every dues-paying member in pursuing every grievance. (See Tr. 694–99) No such duty exists. *See, e. g., Int'l Brotherhood of Elec. Workers v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); *Larkin v. United Steelworkers of America,* 409 F.Supp. 1137, 1140–41 (W.D.N.Y.1976). Moreover, plaintiff knew that she could pursue her grievance to the next step without union support but failed to do so.[6] The evidence clearly shows that neither the Committee nor Professor Levinson discriminated against the plaintiff on the basis of her race. Their actions were based on their reasonable conclusion that her complaint lacked merit.

Plaintiff received a memorandum from Dean Marcus in April 1975 informing her that she would not be promoted, because her performance had "not improved sufficiently to meet the greater demands put upon an administrative secretary." Plaintiff again requested to know whether all four chairpersons concurred in this decision, and was so informed. (PX–15) She filed complaints with New York's Human Rights

---

**6.** Plaintiff in fact pursued a subsequent grievance to the "second step," and it was deter-mined to be meritless. (Tr. 676, 680–83, 687–88).

Commission (NYHRC) and the EEOC in May 1975. In her EEOC complaint she claimed both race and sex discrimination, and certified she had been "1. Harassed. 2. Intimidated. 3. Denied Promotion." (PX–21) Her affidavit asserted that FIT personnel had conspired to make it impossible for her to succeed (PX–22), whereas in fact great effort had been made to give plaintiff a chance to show she could handle greater responsibilities. A hearing was held before the NYHRC, and the complaint was determined to lack probable cause:

> "Extensive investigation has failed to adduce any evidence that complainant's failure to be upgraded was because of her race or color as alleged." (PX–36)

In discussing that proceeding, plaintiff focused on the fact that a black woman named Helen Randolph, who had been given the job plaintiff sought, filed an affidavit stating her belief that no racial discrimination exists at FIT. (PX–31) The suggestion advanced by plaintiff was obvious: that Ms. Randolph's testimony had in effect been bought with a promotion. That suggestion is unfair to Ms. Randolph, and entirely baseless. Plaintiff conceded she knew nothing about Helen Randolph's qualifications. (Tr. 246) The proof showed that Ms. Randolph had already served as an Administrative Secretary at FIT before June 1975, when she was interviewed by Dean Marcus. (See Tr. 414–15) She had been "excessed" from her prior job, apparently due to budgetary needs, and was available for other employment at FIT. She was highly recommended by her former employer, and Dean Marcus found her performance "superior" to plaintiff's. (Tr. 416–18; PX–29–30) Giblin found Randolph "much more accurate" than plaintiff. (Tr. 518) Examination of Ms. Randolph's file indicates her letter typing was graded in 1969 at "100 wpm-excellent"; her overall speed grade was 83. (PX–30) Ms. Fisher's letter typing in 1973 lacked the finished, professional appearance of Ms. Randolph's, and was timed at 80 wpm; her overall speed grade in 1967 was 52, some 31 points below Ms. Randolph's. (PX–29) Thus, nothing in the record supports plaintiff's claim that Randolph was given the job in retaliation for plaintiff's filing complaints against FIT. Randolph was simply a much better secretary than plaintiff, and therefore qualified for the job. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

The evidence therefore fails to prove that Ms. Fisher was the object of racial discrimination by anyone at FIT. On the contrary, it proves she was not. Her claim is therefore dismissed as meritless, and judgment will be entered in behalf of all the defendants, with prejudice.

## II. *Propriety of Attorneys' Fees and Costs*

Defendants seek an award of attorney's fees and costs, as the prevailing parties. Such an award is expressly authorized by Section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), which provides:

> In any action or proceeding under [Title VII] the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs
> . . . . .

Although the award of fees is in a district court's discretion, the Supreme Court has limited awards against plaintiffs to cases in which "a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978). *Accord, Carrion v. Yeshiva University*, 535 F.2d 722, 727 (2d Cir. 1976) ("unreasonable, frivolous, meritless or vexatious"). Because of the deterrent effect of fee awards, courts are not to find a basis for them from "*post hoc* reasoning," or from the plaintiff's ultimate failure to succeed on the merits. *Christiansburg Garment Co., supra*, 434 U.S. at 421–22, 98 S.Ct. at 700; *Aid Auto Stores, Inc. v. Cannon*, 525 F.2d 468, 471 (2d Cir. 1975). On the other hand, Congress intended that clearly frivolous or meritless Title VII suits be deterred by fee awards. *See Kremer v. Chemical Construction Corp.*, 477 F.Supp. 587, 594 (S.D.N.Y.1979). A dis-

trict court may abuse its discretion by refusing, without good cause, to award fees to the prevailing party. *Prate v. Freedman*, 583 F.2d 42 (2d Cir. 1978).

 The evidence introduced in this litigation, and the demeanor of the witnesses, make abundantly clear that plaintiff lacked good faith in bringing suit against FIT, its personnel, the union, and the union's officers. Plaintiff may have believed that she was wronged, but she purposely tried to obscure the truth by claiming ignorance of, or that she could not recall, facts and events relevant to her claim. Whether this constitutes "bad faith" as recently defined in *Nemeroff v. Abelson*, 620 F.2d 339 at 350 (2d Cir. 1980), is not controlling. *Christiansburg* establishes that, under Title VII, subjective bad faith need not be shown. Plaintiff could not reasonably have believed in good faith that she was denied promotion because of her race, and she in fact exhibited subjective bad faith in pursuing her claim.

Furthermore, plaintiff's claim was frivolous and meritless, in that it lacked any factual basis, and was pressed in the face of overwhelming factual evidence that showed that FIT, its personnel, and the union acted on nondiscriminatory bases. It would appear, moreover, that plaintiff's suit was vexatious and brought for oppressive and vindictive purposes, perhaps as a vehicle for forcing defendants to grant her a promotion that the defendants had concluded she did not deserve. These improper motivations became increasingly apparent during the course of the trial from, among other things, the overwhelming documentary and credible testimonial evidence against plaintiff; proof that defendants FIT and Marcus had favored plaintiff in the past; the willingness of the chairpersons to give plaintiff a one-year trial period instead of filling the job she sought with another applicant; the evasiveness and untrustworthiness of plaintiff's testimony concerning almost every important aspect of the case; the fact that plaintiff claims to have realized FIT engaged in racial discrimination only after she was denied a second promotion; the fact that she claimed racial discrimination

against the union and its Grievance Committee without any supporting evidence, simply because they refused to press her grievance; and the fact that she went so far as to attack Helen Randolph, a black with clearly superior credentials, suggesting that Ms. Randolph had supported FIT because she had gotten the job plaintiff sought.

The parties are directed to submit affidavits and argument on what amounts should be charged against plaintiff. In this connection the parties should be guided, first, by the fact that only "reasonable" fees are recoverable. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974). Furthermore, several factors must be considered in determining the amount plaintiff should be required to pay, including the actual costs incurred, plaintiff's ability to pay, the amount that would serve relevant deterrent purposes, and the extent of plaintiff's good faith. *See Faraci v. Hickey-Freeman Co., Inc.*, 607 F.2d 1025 at 1027–1028 (2d Cir. 1979). In the present litigation, an additional factor that will be weighed is FIT's ability to pay to defend itself from suits such as plaintiff's, given the difficulty that publicly-funded institutions encounter in obtaining the resources to deliver their services.

 A further complication in imposing counsel fees upon plaintiff in this case is the fact that some of the fees incurred by defendants were caused by actions of plaintiff's counsel, and were unnecessary for the proper representation of plaintiff. Plaintiff's counsel sought minimal pretrial discovery from defendants, although discovery periods were established and extended. On the second day of trial, however, plaintiff's counsel submitted a subpoena demanding production of extensive documents. (Tr. 92) No surprise development had occurred that would have justified counsel's delay in seeking those materials. Furthermore, counsel announced that several stipulations in the pretrial order were withdrawn, because counsel had signed the pretrial order without consulting his client, who when

consulted refused to stipulate. (Tr. 93) The trial attorney explained that someone else from his office had handled the case during the pretrial process, and that he therefore had been unfamiliar with plaintiff's position. (Tr. 96) Finally, some of the subpoena demands were clearly pointless and vexatious, apparently intended to harass defendants during the trial. The meritless aspects of the subpoena were suppressed, but those materials that were arguably relevant to plaintiff's case were ordered produced, to insure that this civil rights claim would not fail for lack of care and planning by plaintiff's counsel. Counsel was warned, however, that he might be charged with the excess costs generated by his conduct, if appropriate under 28 U.S.C. § 1927. (Tr. 95–96)

Counsel's subpoena forced defendant FIT to produce numerous documents. The Court has read through all the documents introduced by plaintiff as a result of the subpoena, as counsel undoubtedly intended by moving their introduction. But considerable doubt exists that counsel has himself even bothered to read the documents he moved into evidence. They almost all tend to show affirmative action efforts by FIT, some successful, or to reflect that FIT is rational and deliberate in its personnel actions. None of the documents appears to support plaintiff's case, other than the materials concerning an FIT professor's claim of discrimination, on facts entirely different from plaintiff's, and in the face of powerful argument by FIT, leading ultimately to a determination upholding FIT's refusal to promote the individual to full professor. See note 3, *supra*. In any event, plaintiff was asked to submit proposed findings of fact and conclusions of law, and found no reason to refer to a single exhibit (or to a single page of the trial transcript) in support of his untenable assertions.[7] Under the circumstances, counsel is chargeable for the excess burdens caused by his subpoena, which unreasonably and vexatiously increased FIT's costs, and the costs to the public of deciding this litigation.

The proper basis for charging costs to plaintiff's counsel, particularly counsel fees, is still a matter of considerable doubt in the courts. Despite the holding in *Monk v. Roadway Express, Inc.*, 599 F.2d 1378, 1383 (5th Cir. 1979), it would appear both logical and fair to read Title VII itself to authorize the collection of costs, including attorney's fees, from plaintiff's counsel.[8] One cannot safely infer, however, that an attorney knew a claim was meritless when it was filed, merely because it is shown to be meritless after trial. Indeed, such an inference

---

7. Counsel's assertiveness continued after trial, when he wrote a letter to the Court claiming FIT had failed to comply with his trial subpoena in several respects, finding FIT's attorney's explanations "totally incredible and contrary to previous statements, on the record," asking that "appropriate sanctions be applied," and that a finding be made of willful and total disregard for Title VII and all other applicable statutes. Letter of August 20, 1979. No references to the record accompanied this unwarranted attack. Defense counsel's response of August 22, 1979 accurately states the understandings reached concerning the subpoena. It also notes the extraordinary impropriety of plaintiff's counsel submitting an affidavit of plaintiff after the trial was over containing material assertions that could only be considered after proper cross-examination. Both letters and the affidavit are hereby made part of the record.

8. The Court in *Monk* reasoned that 42 U.S.C. §§ 1988 and 2000e–5(k) "provide for attorneys' fees awards against unsuccessful *parties* to a suit, and they focus on actions which are frivolous, unreasonable, and baseless in allowing awards against unsuccessful *plaintiffs*," and that "nothing in the language of those statutes [or the cited cases] . . . authorize the imposition of attorneys' fees against an unsuccessful party's attorneys." 599 F.2d at 1383 (emphasis in original). But 42 U.S.C. § 2000e–5(k) provides only that attorney's fees may be allowed "the prevailing party"; it says nothing about against whom the fees may be charged. Parties and attorneys alike are encouraged by Title VII to bring meritorious suits; both should similarly be discouraged from bringing frivolous suits, although proving an attorney knew a case was frivolous would appear to be properly done only under the standard enunciated in Rule 11, Federal Rules of Civil Procedure. *See Nemeroff v. Abelson*, 620 F.2d at 339, 349, 444 (2d Cir. 1980); *Kinee v. Abraham Lincoln Fed. Savings & Loan Ass'n*, 365 F.Supp. 975, 982–83 (E.D.N.Y.1973).

is not automatically permitted even with respect to the plaintiff, who has far greater access to the facts than counsel in individual discrimination claims. Furthermore, once counsel has taken a case, and filed pleadings that comply with Rule 11 of the Federal Rules of Civil Procedure, withdrawal becomes increasingly impractical as the time for trial approaches. Counsel may cause through his own negligence a delay in acquiring the facts necessary to rebut his good faith belief that a case warrants prosecution. But inadequate pretrial preparation cannot justly be made the ground for a conclusion that counsel knew the case was frivolous.

■ The proper basis for taxing counsel for that aspect of FIT's costs that he willfully and needlessly caused is 28 U.S.C. § 1927. The "complete unsubstantiality" of parts of counsel's subpoena, and of most of his trial and post-trial argument, are a proper indication that these measures were, to some extent at least, not undertaken "in good faith," but were intended to harass. *See Acevedo v. INS*, 538 F.2d 918, 920 (2d Cir. 1976) (imposing double costs on counsel for frivolous motion to reopen deportation ruling). *See also Hutto v. Finney*, 437 U.S. 678, 689, n. 14, 98 S.Ct. 2565, 2573, n. 14, 57 L.Ed.2d 522 (1978).

The Second Circuit has strongly indicated that counsel fees may be considered as part of "costs" under Section 1927, and that under proper circumstances the lawyer rather than the client should bear the expense of his conduct. *Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1089 (2d Cir. 1977). *But cf. Prate v. Freedman*, 583 F.2d 42, 48 (2d Cir. 1978) (reliance upon attorney's judgment in bringing frivolous suit does not excuse plaintiff). A construction of Section 1927 that limited "excess costs" to costs routinely awarded after judgment would deprive the statute of any significant meaning. Ordinary costs are generally negligible; in most cases an award of only such "excess" costs under Section 1927 would involve amounts more likely to cause scornful amusement than to deter vexatious conduct. In adopting such a construction, the Fifth and Sixth Circuits have attributed to Congress an intention in using the word "costs" that is unnecessarily and unrealistically technical.[9] In Title VII itself, for example, Congress authorizes courts to award the prevailing party "a reasonable attorney's fee *as part of the costs* . . . ." Section 706(k), 42 U.S.C. § 2000e–5(k) (emphasis added). Finally, an award of costs under 28 U.S.C. § 1927 cannot fairly be characterized as a criminal or other extraordinary sanction, thereby justifying a restrictive construction. Although the imposition of attorney's fees is not the general rule in this nation, courts and commentators have recognized the inherent power of federal courts to impose costs on attorneys as a disciplinary measure, designed to prevent groundless or vexatious pleadings or conduct. *See generally Ali v. A & G Co., Inc.*, 2 Cir., 542 F.2d 595, 597 (Oakes, J.) (dissenting opinion). The criteria enunciated in 28 U.S.C. § 1927 closely resemble the standard governing the award of costs, including attorney's fees, by courts exercising inherent, equitable authority. Congress can therefore most reasonably be found, by using the criteria in that statute, to have authorized costs including attorney's fees. FIT should therefore submit sufficient information to enable the Court to ascertain the excess costs imposed by counsel's vexatious conduct described above. *See Nemeroff v. Abelson, supra*, at 350–51.

Defendants may conclude, having been vindicated, that pursuit of fees beyond normal costs is impractical or unwarranted under the circumstances. In that event, judgment will be entered forthwith.

Submit proposed judgment on notice.

SO ORDERED.

9. *See Monk v. Roadway Express, Inc., supra*, 599 F.2d 1378, 1381–83, and cases cited therein including *United States v. Ross*, 535 F.2d 346, 350–51 (6th Cir. 1976), and also Judge Robert Carter's creative initiatives in *Nemeroff v. Abelson*, 469 F.Supp. 630 (S.D.N.Y.1979), *rev'd in part and remanded in part*, 620 F.2d at 339, (2d Cir. 1980); *North American Foreign Trading Corp. v. Zale Corp.*, 83 F.R.D. 293 (S.D.N.Y. 1979).