Arthur S. WILSON, Plaintiff,

v.

SUPREME COLOR CARD, INC., and U.P.I. Union Local 413, Defendants.

No. 87 Civ. 37 (KC).

United States District Court, S.D. New York.

Jan. 10, 1989.

Michael Davis, Hughes, Hubbard & Reed, New York City, for plaintiff.

Michael Salgo, Mineola, N.Y., for Supreme Color Card, Inc.

Kenneth Morgan, Chadbourne & Parke, New York City, for U.P.I. Union Local 413.

## OPINION AND JUDGEMENT

CONBOY, District Judge:

Plaintiff in this case asserts that defendant Supreme Color Card, Inc. ("Supreme"), his former employer, discriminated against him in his employment on the basis of race and national origin, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended. He also asserts that, his union, U.P.I. Union Local 413 ("Local 413"), discriminated against him on the basis of race and national origin, in violation of Title VII, by failing to adequately challenge or tacitly acquiescing in Supreme's discriminatory actions. The trial of all claims was conducted on July 13, 14, and 15, 1988 with a jury deciding the § 1981 claim involving defendant Supreme and the Court deciding the Title VII claims involv-

ing defendants Supreme and Local 413. The Jury returned a verdict against defendant Supreme and awarded plaintiff compensatory damages of $18,000.00 and punitive damages of $22,000.00. The Court reserved decision on the Title VII claims. Defendant Supreme now moves pursuant to Rule 50(b) Fed.R.Civ.P. for a judgment notwithstanding the jury verdict, or in the alternative for a new trial on the § 1981 claim. This opinion shall constitute the Court's findings of fact and conclusions of law on plaintiff's Title VII claims, and its decision on defendant Supreme's Rule 50(b) motion.

Certain facts are not in dispute. Plaintiff Arthur Wilson, who is black, is a United States citizen who was born in Trinidad. He began employment as a printer with Supreme on February 3, 1983 and shortly thereafter became a member of Local 413. Supreme presently is, and in 1983 and 1984 was, an employer of fifteen or more employees, engaged in an industry affecting commerce. Local 413 is a labor organization similarly affecting commerce. After plaintiff started working for Supreme, Rene Padilla, a former employee was re-hired by Supreme as a printer. Mr. Padilla, who is Hispanic, was paid a higher salary than plaintiff. As a member of the National Sample Card Manufacturer's Association, Inc., Supreme was party to a collective bargaining agreement (the "Agreement") with Local 413. In October, 1984 Messrs. Wilson and Padilla were both in a bargaining unit represented by Local 413, were covered by the Agreement, and were being paid a higher salary than that required by the Agreement.

On October 20, 1984 plaintiff wrote a letter to Local 413, complaining that Supreme was paying a higher salary to the other Heidelberg pressman, who was not named in the letter, but was Mr. Padilla. Local 413's shop steward at Supreme, Ernestine Hinton, who is black, gave a copy of plaintiff's letter to Jerry Cuccurullo, the President of Supreme. On November 7, 1984 Supreme told five printing department employees, including plaintiff, that they were laid off. On November 15, 1984 three of these employees, but not the plaintiff, were rehired.

On November 21, 1984 H. Rowland Carter, the Business Agent of Local 413, who is also black, sent a letter to Mr. Cuccurullo informing him that "serious charges have been made against you by Mr. Arthur Wilson ... concerning threats you are alleged to have made to him. Local 413 will not condone or allow any of its members, including Mr. Wilson, to be treated in an abusive manner by any employer." DX L(b). On November 28, 1984 plaintiff filed a complaint against Supreme with the Equal Employment Opportunity Commission and the New York State Division of Human Rights alleging discrimination in employment on the basis of race and national origin. On November 18, 1986, the New York State Division of Human Rights declared that there was no probable cause to believe that Supreme or Local 413 had engaged in unlawful discriminatory conduct as regards plaintiff.

*The Evidence At Trial*

The only witness called on plaintiff's case was the plaintiff Arthur Wilson. He testified that when he was hired by Supreme, he had been engaged in the printing trade as a Heidelberg pressman for almost thirty years, Tr. 23–24; that he did more complex work than Supreme's other Heidelberg pressman, Mr. Padilla, Tr. 24; that Mr. Padilla's salary was higher than his, Tr. 27; and that he asked his supervisor for a raise, did not receive it, and complained to the union shop steward Ernestine Hinton about it, to no avail, Tr. 27–28. On October 20, 1984 Mr. Wilson wrote a letter to the union because, he testified, he had been "called yo-yo, the yo-yo" by his supervisor, Mr. Martino (Mr. Cuccurullo's middle name), who "also said that I don't understand because I wasn't born in this country, and moron", Tr. 28–29. An additional reason for writing the letter, according to Mr. Wilson, was as follows: "there was days, two days was given off I think it was Yom Kipper, and they paid some. The whole plant was closed down and they paid some and they didn't pay some. I was one that didn't get paid." Tr. 29.

The letter referred to, received in evidence (PX 1), reads in its entirety as follows:

> 133–05 136th St.
> S. Ozone Pk. N.Y. 11420
> 10/20/84
>
> Local 413
> 1 Union Square
> New York, N.Y. 10003
> Dear Sir/Madam,
>
> I am employed at Supreme Sample Card a member of Local 413
>
> Matter 1   We were told there would be no work on Sept. 27 & 28, the following pay Oct. 5–84.  I was not payed for the 2 days without notice, only a chosen few was payed I pay union dues and the chosen few pay union dues.
>
> Matter 2   I was employed about 5 months before the other Heidelberg pressman, I run the Longer press, I produce more, my quality in some cases are higer these are facts with evidence, yet his pay is higer than mine.  I talk to the boss about it he told me come back 3 times.  There is no question of my exprience on the press, we do the same work our pay must be equal.  I told the shopsteward she said the union cannot do anything about it.
>
> Since Local 413 is affiliated to A.F.L.–C.I.O. I will contact hem to find out why Local 413 allow the Employers to abuse their members.  Please look into this *matter* for me.  1 & 2.  Thank you.
>> Respectfully,
>> ARTHUR WILSON

The Court observes that it contains no complaint against either Supreme or Local 413 based upon or relating to racial discrimination.  It also contains no reference to the aforementioned asserted prior statements of Mr. Martino, to the effect that Mr. Wilson didn't "understand because [Mr. Wilson] wasn't born in this country."

Mr. Wilson testified that shortly thereafter on October 30, 1984 he was called into Mr. Martino's office, and in the presence of Mr. Martino, several foremen, Ms. Hinton and a Mr. Yarde, he was told by Mr. Martino, who had a copy of the October 20, 1984 letter to the union, that he, Mr. Wilson, "could take this letter and wipe my ass with it.  'Don't write the union.  I am the union, and no union is going to tell me what to do.' "  Tr. 31–32.  Mr. Wilson also said that Mr. Martino told the others present that they should keep a daily report on him, and that if he came in late or left early, he would be fired.  Tr. 32–33. The witness also asserted that the union "did nothing" about the October 30 meeting, Tr. 34, although the Court observes, as has already been noted, that Local 413 Business Manager H. Rowland Carter wrote to Supreme on November 21, 1984 and stated that "Local 413 will not condone or allow ... Mr. Wilson to be treated in an abusive manner by any employer.  Mr. Wilson is to be accorded the same rights and privileges as other employees of Supreme Color Card" (DX L(b)).  The exhibit indicates that Mr. Wilson was sent a copy of this letter.

Mr. Wilson testified that he was "laid off" with other employees on November 7, 1984, in that he was told by a foreman "that there is not any work and we should take the rest of the week off and come back Friday for our pay and then we should start back on the following Monday."  When he returned on Friday he was told not to come in on Monday.  Tr. 40. Following his filing of a charge against Supreme of discrimination based upon race and national origin with the Equal Opportunity Employment Commission, Mr. Wilson asserted that he was called on December 26, 1984 by Mr. Martino who suggested a "settlement," but did not offer him a job. Tr. 42–43.  Mr. Wilson testified that he was out of work from November 7, 1984 until June, 1985, when he was hired by Southbridge Press.  He became unemployed in February, 1987 and remained unemployed. Tr. 43–44.

On cross-examination, Mr. Wilson said that on November 7, 1984, four other workers, being Ebenezer Danquah, Clarence Tillett, Clarence Murrell and Mr. Padilla, were laid off with him, that the first three are black, and the fourth, Mr. Padilla is foreign born, and that the first three had seniority over Mr. Wilson.  Tr. 46–48.  Messrs. Dan-

quah, Tillett and Padilla returned to work on November 15. Tr. 50.

In connection with his complaint that he had not been paid for the Jewish holidays (PX 1), Mr. Wilson agreed that the controlling collective bargaining agreement (Joint X J(1)) required each employee to make an election of one paid holiday out of four listed, and that he had in fact elected Good Friday in 1984, had not worked, and had been paid. Tr. 84. Mr. Wilson agreed that when he was hired as a printer I by Supreme in 1984 the required scale salary under the Agreement was $237.88 a week, but that he had received $302.00 a week.

Mr. Wilson conceded that the Agreement authorized "attendance bonuses" of one extra hour's pay for each complete 40 hour work week completed, and insisted that he had an "excellent" record of attendance in 1984.

While being cross-examined on his assertion that Mr. Martino did not offer him a return to work in the December 26, 1984 telephone call, Mr. Wilson was confronted with a letter he wrote to Local 413 on the same day, in which he wrote "I received a call from Mr. Martino he said I must come to work today 12/26/84." (Joint DX A). Moreover, when examined further on the document, he did not in any way repudiate his statement in the letter that "I will work with Mr. Martino only if the decision of the EEOC and HRC say I must work with him."

Mr. Wilson conceded on cross-examination that Mr. Martino never made any racial slurs toward him. Tr. 70. With respect to the October 30th meeting, the following colloquy occurred between Mr. Wilson and counsel on the subject of Mr. Martino's asserted instruction to the shop steward to keep a report on Mr. Wilson:

Q. He directed the shop steward to keep a report on you?

A. That's right, all of them that was in the meeting, he told them.

Q. You said there were no reports kept on you before the meeting. Do you know if there were any reports kept on you after the meeting?

A. If there is any report kept on—

Q. Yeah, if there were any reports kept on you after the meeting?

A. Well, once I saw the one of the—I left the press for a short time and I went to the bathroom, to the toilet and, when I came back, one of them was talking to Mr. Martino, so I was of the opinion that they was telling him that I went away from the press without saying anything.

Q. You didn't hear that conversation?

A. I didn't.

Q. You don't know if—that conversation could have been unrelated to you entirely. Isn't that correct?

A. I guess so.

With respect to his claim that Supreme was responsible for his being fired from Southbridge, Mr. Wilson conceded that he had no proof to support the claim. Tr. 72–73. Regarding Mr. Wilson's complaint in his October 20, 1984 letter (PX 1) about the salary disparity between himself and Mr. Padilla, the witness conceded that prior to writing it he had gone to shop steward Hinton and she had given him her opinion that the salary levels in question were entirely proper. Tr. 90–91.

When counsel asked Mr. Wilson whether Ms. Hinton, told him "the Union could do nothing about it, because you were black", Mr. Wilson replied, "she told me what she think was right, that is what she told me." He also said that she did not base her statement on the fact that he was born in Trinidad. Tr. 103. Mr. Wilson agreed that he never advised the Union of his layoff by Supreme or asked his Union's help concerning it. Tr. 105–109. After he learned that laid off employees had been recalled, including Mr. Padilla, ahead of him, he never complained to or filed a grievance with his union. Tr. 109–110. When confronted with deposition testimony in which he stated that he did not know if the Union discriminated against him on the basis of race or national origin, Mr. Wilson in substance said the basis of his complaint against the union was his belief that the Union "condoned what the employer was doing." Tr. 112–113.

The Union called a single witness, H. Rowland Carter, the Business Manager of Local 413. He indicated that since Mr. Wilson was in the Printer I classification and was making $302 weekly in 1983, or $65 more than the contractual minimum, he told Mr. Wilson he couldn't get him any more money except at contract time, when he'd be negotiating for all union members in the shop. Tr. 130. Mr. Carter, indicated that the union office consists of three individuals: himself, another business agent who is black, and a secretary, who is hispanic. Tr. 131. The witness stated that when he received Mr. Wilson's October 20, 1983 letter, he sent it to the Supreme shop steward, Ms. Hinton, to investigate, and that she made inquiry and concluded that "he was being paid properly and that he was off Good Friday, he wasn't entitled to any holidays, but he didn't accept our answer." Tr. 133. Mr. Carter further indicated that nothing in the Agreement authorized the Union to prevent Supreme from closing on the Jewish Holidays, which it did do in September, 1983. Tr. 135. With respect to the pay levels of Messrs. Wilson and Padilla, Mr. Carter testified as follows:

Q. Turning your attention—we have talked about Matter No. 2, which is Mr. Wilson's wage claim that he was paid less than the other Heidelberg pressmen?

A. Mr. Wilson is a little confused about this whole situation. We don't have Heidelberg pressmen. Our contract has classifications, such as all-around printer, which Mr. Padilla was classified as. It also has Printer 1, which Mr. Wilson was classified as.

Now, they both were paid above the rate, but the all-around printer classification pays more than Printer 1.

Q. Is there anything that you could do to get Mr. Wilson a larger merit increase than that situation?

A. Only if he became an all-around printer and was able to operate all of the equipment. All he could operate was the Heidelberg. Tr. 135–136.

Mr. Carter also testified about a personal meeting he had with Mr. Wilson shortly after he had received the aforementioned advice from Ms. Hinton. Mr. Wilson was told that, in Mr. Carter's opinion, "he had no grievance", and Mr. Wilson merely said "Thank you", and made no claim that the Union was discriminating against him based upon his race or national origin. Tr. 136–137.

With respect to Mr. Wilson's aforementioned December 26 letter to the Union (DX A), Mr. Carter testified that upon reading it, he understood that Mr. Wilson had been offered a return to work, and he refused to go back, thereby abandoning his job. Tr. 142. Mr. Carter also stated that in November, 1984 the racial makeup of Local 413 was about 80 percent Black and Hispanic, and Supreme was 90 percent or more Black or Hispanic. Mr. Carter commented on his November 21, 1984 letter to Mr. Cuccurullo, the President of Supreme, in which he had said "serious charges have been made against you by Arthur Wilson concerning threats you're alleged to have made to him." Tr. 143. This statement in the letter was made, according to Mr. Carter, without investigation and solely up the complaint of Mr. Wilson that Mr. Cuccurullo "picks on me". Tr. 144. Mr. Carter also insisted that the matter of layoff and recall as it related to the seniority of Messrs. Wilson and Padilla was never raised with the Union by Mr. Wilson. Tr. 147. Mr. Carter also stated the November, 1984 layoffs at Supreme coincided with the relocation of its office. Tr. 149. Finally, the witness insisted that under the Agreement, Mr. Wilson had no grievance. Tr. 157.

Supreme called three witnesses, Ms. Ellen Cuccurullo, secretary of Supreme; Mr. Cuccurullo, the president of Supreme, and Mr. Morris Yarde, a foreman-supervisor at Supreme.

Ms. Cuccurullo testified that she handled personnel matters and records for Supreme. Tr. 159. She also said that in the fall of 1984 Supreme received notice from its landlord that the building, at 655 Avenue of the Americas, was being vacated, and in early November, Supreme received an eviction notice, requiring vacating of the premises by December 1. The November 7 layoff was caused by the relocation and a

slowdown in business. Tr. 161. Of thirty-five to forty union employees on Supreme's payroll in 1984, there was only one non-minority member, and the employees were "for the most part foreign born." Tr. 163. The move required dismantling of the machinery by mid-November, including the Heidelberg presses, and the printing department was moved in several stages. The presses could not have been reassembled prior to December 21, which was the official date of the move. Tr. 164.

Ms. Cuccurullo also examined Supreme's earnings and hour records for Mr. Wilson for 1984 (DX A), as they relate to the aforementioned attendance bonus under the Agreement, and concluded that for the entire year, Mr. Wilson had perfect attendance for only three work weeks. Tr. 172. She also asserted that although Mr. Wilson had been hired one month prior to Mr. Padilla's rehiring, the latter received a higher salary because of his prior employment with Supreme, which had begun in 1975 and was interrupted for a seven month period ending in February, 1983. Tr. 176–177.

Jerald Cuccurullo testified that he uses his middle name Martino for convenience in his business, Tr. 179, that the move to the new location on 18 Street across Sixth Avenue involved the stripping down of 12,000 lb. presses to 2,500 components, and that Messrs. Padilla, Tillett and Danquah were brought back from layoff to assist in this manual labor. Tr. 188–190. Business was so bad during this period (November—December, 1983) that Supreme considered filing for bankruptcy, according to the witness. Tr. 190.

Mr. Cuccurullo insisted that Mr. Wilson had never come to him and requested an increase in salary, Tr. 194, and that on the Heidelberg press Mr. Wilson "has difficulty dye cutting, has difficulty scoring and he never proved to me he could do it. Mr. Padilla, since 1968 [at another color card company] that I know him, he has done the job." Tr. 195.

Regarding the December 26, 1983 telephone call he had with Mr. Wilson, Mr. Cuccurullo testified that "I asked him to come back to work because I needed him and I stressed the point, 'I need you, Arthur'." Tr. 198. With respect to Mr. Wilson's assertion that at a meeting subsequent to the sending of his October 24, 1984 letter, Mr. Cuccurullo had ordered the staff to make special reports on him, the witness flatly denied it. Tr. 200. Finally, he insisted that the reason for laying off Messrs. Danquah, Tillett, Murrell, Padilla and Wilson was that "I had no work for the [men]". Tr. 200–201.

Morris Yarde testified that at the October, 1984 meeting, at which Messrs. Cuccurullo, Wilson, and Ms. Hinton were present, he received no orders from Mr. Cuccurullo to make daily reports on Mr. Wilson, Tr. 208. He also asserted that Mr. Padilla was a superior employee to Mr. Wilson in skill and attitude. Tr. 209–210. He flatly denied that the layoff of Mr. Wilson was based upon his race or national origin. Tr. 211–212.

*The Rule 50(b) Motion of Supreme*

A judgment n.o.v. permits the trial court to correct the verdict of the jury when there is a complete lack of probative evidence to support the verdict, or if the evidence is so strong and overwhelmingly in favor of the losing party that reasonable and fair minded jurors in the exercise of their impartial judgment could not have arrived at the verdict rendered. *Unijax, Inc. v. Champion International, Inc.*, 683 F.2d 678 (2d Cir.1982), *Gehrhardt v. General Motors Corp.*, 581 F.2d 7 (2d Cir.1978).

A racial discrimination case under Section 1981 requires a plaintiff to ultimately prove a discriminatory intent. *Anderson v. Local Union No. 3, International Brotherhood of Electrical Workers*, 582 F.Supp. 627 (S.D.N.Y.1984), *aff'd.* 751 F.2d 546 (2d Cir.1984); *U.T.B., United Third Bridge, Inc. v. Local #3, International Brotherhood of Electrical Workers*, 512 F.Supp. 298 (S.D.N.Y.1981).

More recently, it has been held that Title VII standards established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207

(1981) apply to employment cases brought under Section 1981. *Richards v. N.Y.C. Board of Education,* 668 F.Supp. 259 (S.D. N.Y.1987), *aff'd.,* 842 F.2d 1288 (2d Cir. 1988):

> The basic allocation of evidentiary burdens in an employment discrimination case are as follows:
>
> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 at 252–53, 101 S.Ct. 1089 at 1093, 67 L.Ed. 2d 207. (citations omitted). *Id.* at 264–65.

This Court essentially incorporated the statement of *Burdine* in its charge, Tr. 258:

> To prove his claim, Arthur Wilson must prove by a preponderance of evidence that Supreme Color Card took action against him for asserting his right to equal opportunity and treatment in employment. Arthur Wilson doesnot have to prove retaliation was Supreme Color Card's only motive, but he must prove that the Supreme Color Card intentionally acted at least in part to retaliate.
>
> To determine that question, you should analyze the proof in the following manner: If you find that Arthur Wilson has proved that there was a retaliation, then you must decide whether Supreme Color Card has given a non-retaliatory explanation for its treatment of Arthur Wilson. If you find Supreme Color Card has given such an explanation, then you must decide whether Arthur Wilson has proved by a preponderance of evidence that the reasons given by Supreme Color

Card were not the true reasons for its action, that is, that they were pretexts for the retaliation.

■ Plaintiff, in Paragraph 9 of his complaint, asserted the relevant facts which were the subject of the EEOC and NYS HRC investigations and which were the primary and salient focus of the trial:

> On Oct. 20 84 I filed charge against my Employer with my Union. My Union refused to process on grievance. My Union send a a copy of the letter to my Employer to process my grievance. My Employer told me don't write the Union he is the union. No Union is going to tell him what to do. I wrote the Union a second time. The Union send a copy of the letter to my Employer to process my grievance. My Employer fired me Nov. 7/84 because I file charge with my Union and N.L.R.B.

Plaintiff's counsel in his opening statement informed the jury that this "... is a case of discriminatory retaliation", Tr. 29. Again, in response to motions for a directed verdict at the close of plaintiff's direct case, Mr. Davis reiterated "that our claim is discriminatory retaliation", Tr. 122. Furthermore, the Court in charging the jury, with the consent of the parties, made reference to the theory of retaliation, i.e., the general verdict form, Tr. 256–257, 258, and the previously quoted shifting burden portion of the charge. It is readily apparent and irrefutable, when viewing the essential facts in chronological sequence on the full and complete trial record, that there is no logical basis for a retaliation claim, since the layoff about which plaintiff alleges racial motivation occurred prior to his complaint of racial discrimination.

Plaintiff was hired by Supreme during the month of February, 1983, Tr. 24, at a rate of $290.00 per week Tr. 27. At the time he was hired and throughout his employment, plaintiff was a Printer 1, Tr. 56, 185. The minimum pay scale under the Agreement, at the time of plaintiff's hiring, was $221.62. Joint X 1.

Rene Padilla was rehired by Supreme in March of 1983 as an All–Around Printer, Tr. 145–177. Mr. Padilla had previously

worked for Supreme from 1975 to July 1982, Tr. 176–177, 186. All–Around Printer is a higher job classification requiring a higher pay scale than Printer 1 under the Agreement. Joint X 1.

Mr. Wilson asked Mr. Cuccurullo for a pay raise on at least two occasions and the second time was told by Mr. Cuccurullo that "the union is going to have some negotiations" Tr. 27–28. The second request was on or about October 20, 1984, and Mr. Cuccurullo's reply merely indicated the fact that the then current Agreement was to expire on November 15, 1984. Joint X 1. Mr. Wilson agreed that, among other things, the union and the employers negotiating the new collective bargaining agreement would be negotiating a new wage package, Tr. 64. At the time of this request (i.e. October 1984), Mr. Wilson was making a salary of $302.00 per week, Tr. 57, while the union scale merely required the employer to pay the sum of $237.88 per week, Tr. 57. Effective November 15, 1984, Mr. Wilson anticipated a salary increase. Tr. 64.

On October 20, 1984, plaintiff wrote a handwritten letter to Local 413. PX 1. It is notable that Mr. Wilson did not make reference in this letter to the other Heidelberg pressman by race. And, a simple and fair reading of the entire letter shows no reference (blatant or subtle) to an issue of race, as Mr. Wilson testified. Tr. 65.

Mr. Wilson, prior to October 20, 1984, spoke with the shop steward, Ernestine Hinton, about his claim of unequal pay, and she told plaintiff there was nothing the union could do about his problem. Tr. 89. H. Rowland Carter, business manager for Local 413, testified that the union considered the fact that Mr. Wilson was making approximately $65.00 over the prevailing contractual minimum to be a merit increase and that Mr. Wilson was told that he would automatically get an increase if wages were increased by the next contract. Tr. 129–130.

The first paragraph of the October 20, 1984 letter refers to Mr. Wilson not being paid for the Jewish Holidays of 1984. As the Court has already observed, Mr. Wilson admitted on cross-examination that, under the collective bargaining agreement, each employee was entitled to a paid holiday out of a grouping of holidays and that plaintiff had selected Good Friday, that he did not work that day, and was paid. Tr. 53. Mr. Carter explained that Mr. Wilson was only to be paid for the holiday which he selected, Good Friday. The fact that Supreme closed for the Jewish Holidays in 1984 and didn't pay Mr. Wilson was within the discretion of the employer. Tr. 133.

What is plainly obvious about the October 20, 1984 letter is that Mr. Wilson complained solely about matters of contract interpretation. If the jury drew any racial inferences from the October 20, 1984 letter, they could only be a product of excessive and unjustified speculation. There is plainly and conclusively no reference to race in this crucial trial document.

The timing of Wilson's race-oriented complaints, such as they are, is central to the liability issue because, as the Court has already observed, this is a case based upon a theory of discriminatory retaliation. Plaintiff has claimed that Supreme violated Section 1981 by retaliating against him for complaining about race discrimination. Prior to looking for an act of retaliation, Mr. Wilson must first prove that he made a complaint about racial discrimination.

In a shop of minorities which was at least 90% black or Hispanic, Tr. 143, no reasonable and fair minded juror could infer that a contractual complaint has racial significance in the absence of some clear articulation concerning race. Mr. Wilson admitted, on cross-examination, that his first reference to race post-dated the allegations in the court complaint, in that it was made to the EEOC, Tr. 65, Tr. 99.

Even assuming that everything Mr. Wilson asserts about the October 30, 1984 meeting in Mr. Martino's office in fact occurred, there is plainly no element of race implicated. Mr. Wilson testified that Mr. Martino said "Don't write the Union. I am the Union, and no Union is going to tell me what to do", Tr. 32, and that all those present at the meeting were told to make

daily reports on Mr. Wilson, Tr. 33. There is here no reference whatsoever to race.

While Mr. Wilson may believe that he was the subject of secret conversations following the October 30th meeting, it is not reasonable to assume that these conversations took place, and any conclusion that they did take place is based upon inference which cannot be supported by the evidence of the case. More to the point, and decisively, even if an inference could be so drawn, there is utterly no evidence that an issue of race was involved.

Mr. Wilson's claim in the complaint, it must be emphasized, is that he was laid off on November 7, 1984, in response to events preceding that date. At that point, no discrimination by Supreme based upon race had been complained of or is established in the record, although plaintiff had been quite vocal about his contractual disagreements with Supreme.

Only on November 28, 1984, with his filing of the EEOC complaint, does Mr. Wilson assert racially motivated discrimination by Supreme, but by this date the purported retaliatory act by Supreme, the November 7th layoff, had already taken place. The recall of two of the most senior blacks and the more versatile Mr. Padilla occurred on November 15, 1984, also *before* the first racial charge against Supreme.

■ Faced with this formidable obstacle to justification of the jury's verdict, which was indisputably based upon a theory of discriminatory retaliation, plaintiff belatedly argues that the recalling on January 5, 1985 of Clarence Murrell, a black with more seniority than Mr. Wilson, is the post-November 28, 1984 retaliatory act of Supreme that supports the jury's verdict.

"The jury could have reasonably believed that failing to recall Arthur Wilson after recalling Clarence Murrell on January 5 was an act by Supreme in retaliation for Mr. Wilson's filing of the November 28, 1984 EEOC complaint." (Plaintiff's memorandum, 9).

The difficulty with this reasoning is that it wholly distorts the trial record, in that the discriminatory claim was rooted in the treatment of the plaintiff vis-a-vis Mr. Padilla and not Mr. Murrell. Furthermore, putting aside the question of whether the jury could have found on the evidence that Supreme did not offer plaintiff a recall to his job on December 26, 1983, Mr. Wilson did not dispute on the witness stand his statement in his December 26, 1984 letter that he would not return to Supreme under any circumstances unless he was forced to do so by the EEOC, and the Human Rights Commission, which of course never happened. Since he had effectively repudiated his job on December 26, 1984 the jury could not reasonably have found defendant's failure to recall Mr. Wilson in January of 1985 to have been retaliatory.

■ Finally, the Court notes that after Supreme presented its nonretaliatory explanation for the layoff of Mr. Wilson and the recalling of Mr. Padilla ahead of Mr. Wilson, plaintiff offered no rebuttal. In proving that an employer's stated reason is pretext, a plaintiff does not necessarily have to present new evidence on rebuttal: "there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. This, however, is not such a case.

Based upon a full review of the trial record herein, it is clear that plaintiff has failed to show that he asserted any protected rights in the relevant time context of the events as they have been established. Moreover, Mr. Wilson failed to prove that Supreme under any interpretation of the evidence acted in retaliation for his claims even assuming, arguendo, they could be interpreted as alleging racial discrimination.

In addition to a lack of work, Supreme was forced to fully relocate its operations. The move was done in stages and took forty five days to accomplish, Tr. 188, and coincided with a traditionally slow business period, Tr. 161. No reasonable and fair-minded jury could find that Supreme laid off five minority men, fabricated a loss of

lease, moved its plant and lost business, as a pretext to discriminate against Mr. Wilson. Thus, Mr. Wilson under *Burdine* failed to show that Supreme's explanation of its conduct was a pretext for racial discrimination, and the record does not support such a conclusion. The record is wholly inadequate on proof of racial discrimination against Mr. Wilson.

The Court concludes that the jury's verdict was not supported by the weight of the probative evidence, and that the evidence was strongly and overwhelmingly in favor of Supreme. After review of the testimony in a light most favorable to Mr. Wilson, and granting him all reasonable inferences, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979) *cert. den.* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), the Court finds that a reasonable and fair minded jury in the exercise of its impartial judgment could not have arrived at a verdict against Supreme, *Gehrhardt, supra; Unijax, supra; Sirota v. Solitron Devices Inc.* 673 F.2d 566 (2d Cir.) *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982).

Accordingly, the motion of defendant Supreme Color Card, Inc. to set aside the jury verdict as against the weight of evidence is granted, and judgment on plaintiff's 1981 claim is entered in favor of defendant Supreme.

### The Title VII Claims Against Supreme Color Card and Local 413

1. Title VII protects individuals in a disparate treatment case, such as this one, only against intentional discrimination on the basis of race or national origin. Plaintiff may not recover unless defendant was guilty of intentional discrimination against plaintiff. Proof of discriminatory motive is essential. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Woodbury v. New York City Transit Authority*, 832 F.2d 764 (2d Cir.1987).

2. Plaintiff has the burden of proving by a preponderance of the evidence that defendants have violated Title VII. Plaintiff must prove his case by evidence which a person with a reasonable and impartial mind would believe is stronger than the evidence of the defendants. *McDonnell Douglas; Woodbury.*

3. Each defendant has denied that it made any decision regarding plaintiff or his employment based upon intentional racial or national origin discrimination. Each defendant has articulated that its decisions concerning plaintiff or his employment were for other reasons.

4. Neither defendant has the burden of proving that its decisions regarding plaintiff or his employment were not based upon intentional racial discrimination. The burden of proving intentional discrimination remains upon plaintiff throughout the case. *Burdine; Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *McDonnell Douglas; Woodbury.*

5. Where, as here, a defendant articulates and shows that decisions concerning plaintiff were based upon factors other than intentional discrimination, then, plaintiff has the burden of negating such evidence by proving that such factors were a mere pretext for the alleged discrimination. *Id.*

6. A plaintiff in a discharge case may make out a *prima facie* case of discrimination by establishing the following elements by a preponderance of the evidence: (a) that he is a member of a protected class; (b) was qualified for the position held; *and* (c) was discharged and replaced by a person outside of the protected class *or* was discharged while a person outside of the class with equal or lesser qualifications was retained. Plaintiff can establish a "*prima facie* case" of discrimination only if all of these elements are satisfied. If a plaintiff meets these criteria, an inference of discrimination is raised and the law creates a rebuttable presumption of discrimination. To rebut this presumption, a defendant need only articulate a legitimate, nondiscriminatory reason for the discharge.

A defendant's burden in this respect is one of production, not proof. Further, the reason proffered by a defendant does not have to be a good reason or one that the Court would act on or approve so long as it is not a discriminatory reason. If a defendant meets this burden of production, the plaintiff must then prove by a preponderance of the evidence that the asserted legitimate reason is pretextual or, more directly, that a discriminatory reason motivated the discharge. *McDonnell Douglas; Burdine; Woodbury.*

7. To establish a claim that he was terminated in retaliation for his having filed a discrimination charge against defendant with the Equal Employment Opportunity Commission ("EEOC"), plaintiff must show that (a) he participated in protected activity under Title VII; (b) an adverse employment decision was made regarding him; and (c) there was a causal connection between the two, that is, a retaliatory motive was a determining factor in the adverse employment action. *Davis v. State University of New York,* 802 F.2d 638 (2d Cir. 1986); *Grant v. Bethlehem Steel,* 622 F.2d 43 (2d Cir.1980).

8. A union has no duty to challenge practices that were not the subject of a complaint by a member. *Thornton v. East Texas Motor Freight,* 497 F.2d 416 (6th Cir.1974); *Shuman v. Galileo–Capri Salami,* 100 LRRM 2413 [1978 WL 139] (N.D. Cal.1978) (BNA); *Capers v. Long Island Railroad,* 6 FEP 30 [1973 WL 131] (S.D.N.Y.1973) (BNA).

9. An individual does not have an absolute right to have his or her grievance taken to arbitration. A union must be allowed a broad range of reasonableness in determining whether to arbitrate a particular grievance. *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Ford Motor Corp. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); *Cunningham v. Safeway Trials, Inc.,* No. 84 Civ. 3936, slip. op. (S.D.N.Y. June 14, 1985) [1985 WL 1684]; *Fisher v. Fashion Institute of Technology,* 491 F.Supp. 879 (S.D.N.Y.1980).

10. Defendant Supreme Color Card has offered a legitimate, nondiscriminatory reason for treating plaintiff differently than his fellow employee Rene Padilla.

11. Specifically, Supreme treated plaintiff differently than Mr. Padilla because Mr. Padilla had more printing experience and skills than plaintiff.

12. Plaintiff has failed to prove that defendant's stated reason for the disparate treatment was, in fact, a pretext. Plaintiff has failed to rebut Supreme's evidence that Supreme temporarily laid off plaintiff for valid economic reasons and that the order of recall of employees was rationally motivated by a sound business decision.

13. The layoff of plaintiff in November, 1984 was based upon economic necessity relating to a down-turn in the business of defendant Supreme Color Card, financial difficulties plaguing the company, and the dislocation brought about by eviction from its facilities and the process of relocation to a new site.

14. The rehiring of Rene Padilla, an individual who had less immediate seniority but far more aggregate service with the company than the plaintiff, was based upon the superior skills and experience of Mr. Padilla and the felt needs of Supreme Color Card with respect to those skills, and not in any way or manner upon discrimination in connection with plaintiff's race or national origin.

15. Plaintiff has failed to prove by a preponderance of the evidence that Supreme retaliated against him for opposing a prohibited discriminatory practice or participating in a proceeding alleging prohibited discrimination in employment.

16. Plaintiff has failed to establish that Supreme harassed plaintiff and "blacklisted" him in retaliation for his complaints about discriminatory conduct.

17. In the fall of 1984, Supreme was comprised of over 90 percent minority employees.

18. Plaintiff's grievance set forth in his letter of October 20, 1984 and in his related conversation with Ernestine Hinton, shop steward, was not based upon discrimination

related to Mr. Wilson's race or national origin, but upon wage and holiday pay disagreements, and does not constitute a complaint or grievance based upon unlawful discrimination.

19. Defendant Supreme Color Card was not in violation of the Collective Bargaining Agreement with Local 413 with respect to plaintiff's wage and holiday pay complaints.

20. On December 26, 1984, the plaintiff was offered reemployment by Supreme Color Card and declined to accept it, thereby voluntarily and permanently abandoning his position.

21. The Court finds crucial and substantive parts of Mr. Wilson's testimony to be inconsistent with his letters of October 20 and December 26, 1984 and notes again his statement that Mr. Martino (Cuccurullo) (or indeed, on the basis of the full record, anyone else at Supreme) never made any racial slurs against him. The Court is also mindful of Mr. Wilson's admissions that he had no proof to support his claims that Supreme was responsible for his firing from Southbridge, and that negative reports about him were being given to his superiors at Supreme.

22. Accordingly, plaintiff has failed to establish by a preponderance of the evidence that the defendant Supreme Color Card, Inc. has discriminated against him on the basis of race or national origin.

23. Plaintiff never complained to Local 413 that his layoff was improper or that he was not properly recalled, and plaintiff never complained to Local 413 that Supreme discriminated against him on the basis of race or national origin.

24. With respect to plaintiff's complaint about wages, Local 413 informed Supreme of plaintiff's complaint, determined that Supreme had not violated the Labor Agreement, and informed plaintiff of its determination.

25. With respect to plaintiff's complaint about harassment, Local 413 wrote a letter to Supreme stating that it would not allow Supreme to abuse any of its members. After Local 413 wrote the letter, plaintiff did not ask Local 413 to pursue the matter further.

26. In the fall of 1984, Local 413 was comprised of approximately 80 percent minority members.

27. Plaintiff's complaint communicated to Local 413, embodied in his letter of October 20, 1984, and in his statement to Ernestine Hinton, his shop steward related solely to grievances involving holiday pay and wages.

28. The plaintiff's grievances were not actionable under the prevailing Collective Bargaining Agreement between Supreme Color Card and Local 413, and Local 413 was without authority to redress them.

29. Plaintiff has conceded that he does not know if the decisions in this matter involving Local 413 officials Ernestine Hinton and H. Rowland Carter, both of whom are black, were based upon discrimination in connection with his race or national origin.

30. Plaintiff never raised with Local 413 a grievance related to the layoff and recall procedure at Supreme Color Card in the fall and winter of 1984, and therefore Local 413 had no duty to investigate it.

31. Accordingly, plaintiff has failed to establish that defendant Local 413 has discriminated against him on the basis of race or national origin or failed to adequately represent him in challenging Supreme's actions.

Based upon the foregoing, the Court concludes that defendants Supreme Color Card, Inc. and U.P.I. Union Local 413 are entitled to judgment in their favor on the plaintiff's Title VII claims.

## CONCLUSION

The Clerk of the Court is directed to enter judgment against plaintiff and in favor of defendant Supreme on the § 1981 claim, and in favor of defendants Supreme and Local 413 on the Title VII claims, and all claims of the plaintiff are dismissed.

SO ORDERED.